The **BRONX HOUSEHOLD OF FAITH, Robert Hall, and Jack Roberts, Plaintiffs,**

v.

**BOARD OF EDUCATION OF the CITY OF NEW YORK and Community School District No. 10, Defendants.**

**No. 01 Civ. 8598 (LAP).**

United States District Court, S.D. New York.

June 29, 2012.

Benjamin W. Bull, Alliance Defense Fund Law Center, Joseph P. Infranco, Alliance Defending Freedom, Scottsdale, AZ, Jordan Woodard Lorence, Alliance Defense Fund, Washington, DC, Joseph A. Ruta, Ruta & Soulios LLP, New York, NY, Rena Marie Lindevaldsen, Liberty Counsel, Longwood, FL, David J. Hacker, Alliance Defense Fund, Folsom, CA, for Plaintiffs.

Jonathan L. Pines, Lisa Fleming Grumet, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

## OPINION AND ORDER

### LORETTA A. PRESKA, Chief Judge.

The Bronx Household of Faith, Robert Hall, and Jack Roberts ("Plaintiffs") seek a permanent injunction against the Board of Education of the City of New York (the "Board")[1] and Community School District No. 10 (collectively, "Defendants") so that Plaintiffs' Church may continue to hold Sunday religious worship services in a New York City public school, as it has done without interruption since this Court issued an initial preliminary injunction in 2002 barring Defendants from enforcing a regulation that would prohibit Plaintiffs from conducting their religious worship services in the Board's schools.

On February 24, 2012, the Court issued an order [Dkt. No. 131] granting Plaintiffs' most recent motion for a preliminary injunction and enjoining Defendants from enforcing Chancellor's Regulation D–180 so as to deny Plaintiffs' application or the application of any similarly-situated individual or entity to rent space in Defendants' public schools for morning meetings that include religious worship. *See* 855 F.Supp.2d 44 (S.D.N.Y.2012) ("*Bronx III*").[2] Defendants immediately appealed, but the Court of Appeals declined to hear the appeal and instead directed this Court to render a final judgment. *See Bronx Household of Faith v. Bd. of Educ. of the City of N.Y.*, No. 12–0751, slip op. at 2 (2d Cir. Feb. 29, 2012). Consequently, the parties agreed to expedite limited discovery and set a briefing schedule for submitting their cross-motions for summary judgment. The Court heard oral argument on the motions on June 1, 2012. For the reasons stated below, Plaintiffs' motion for summary judgment is GRANTED, and Defendants' cross-motion for summary judgment is DENIED.[3]

---

1. Not so far into this litigation the Board of Education was renamed the Department of Education. While this opinion remains faithful to the captioned name, references to the Board should be treated as synonymous with the Department of Education.

2. For consistency's sake, the case abbreviations used in this opinion to refer to the multiple pronouncements in this litigation in both this Court and the Court of Appeals follow those this Court used in its February 2012 opinion.

3. The Court has considered the following submissions in connection with the parties' motions: Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment; Plaintiffs' Opposition to Defendants' Cross–Motion for Summary Judgment and Reply in Further Support of Plaintiffs' Motion for Summary Judgment; Memorandum of Law of *Amicus Curiae* the Becket Fund for Religious Liberty in Support of Plaintiffs' Motion for Summary Judgment ("Becket Mem."); Memorandum of Law of *Amici Curiae* Council of Churches of the City of New York et al. in Support of Plaintiffs' Motion for Summary

## I. BACKGROUND

### A. *Relevant Facts*

The history of this litigation, which dates back to 1995, has been recounted multiple times throughout its multiple movements between this Court and the Court of Appeals, including most recently in this Court's February 2012 opinion granting Plaintiff's motion for a preliminary injunction. *See Bronx III*, 855 F.Supp.2d at 46–52. The Court thus presumes the readers' familiarity with the facts of the case and recites here only those facts most pertinent to the parties' cross-motions for summary judgment, especially those which have come to light during recent discovery.[4]

The Bronx Household of Faith (the "Church") is a 37–year–old, "community-based" Christian church. *Id.* at 46–48. Approximately ninety people currently attend the Church, including thirty children. (Hall Decl. ¶ 5.) Pursuant to an initial preliminary injunction granted in an earlier phase of this litigation, the Church has used the school auditorium in P.S. 15 in the Bronx, New York, on a weekly basis since 2002 for purposes of holding its Sunday worship services. *Bronx III*, 855 F.Supp.2d at 46–48. The Church has moved five times since its inception, each move necessitated by the need for a larger space to accommodate all those who attend the Church's services and meetings. (Hall Decl. ¶ 4.) P.S. 15 currently serves the Church's need to "meet collectively in one

Judgment; Plaintiffs' Response to Defendants' Re–Filed 2005 Statement of Material Facts Pursuant to Rule 56.1 ("Pl. 56.1"); Plaintiffs' Response to Defendants' Supplemental Statement of Material Facts ("Pl. Suppl. 56.1"); Declaration of Jordan W. Lorence in Support of Plaintiffs' Motion for Summary Judgment, dated April 20, 2012 ("Lorence Decl."); Second Declaration of Katie Lynn Geleris in Support of Plaintiffs' Motion for Summary Judgment, dated May 11, 2012 ("Geleris Decl."); Second Declaration of Travis C. Barham in Support of Plaintiffs' Motion for Summary Judgment, dated May 14, 2012 ("Barham Decl."); Declaration of Brad Hertzog, Pastor of Reformation Presbyterian Church, in Support of Plaintiffs' Motion for Summary Judgment, dated April 19, 2012 ("Hertzog Decl."); Declaration of Ryan Holladay, Pastor of Lower Manhattan Community Church, in Support of Plaintiffs' Motion for Summary Judgment, dated May 2, 2012 ("Holladay Decl."); Declaration of Marilynn N. Cole in Support of Plaintiffs' Motion for Summary Judgment, dated May 10, 2012 ("Cole Decl."); Declaration of Jeremy Del Rio in Support of Plaintiffs' Motion for Summary Judgment, dated May 11, 2012 ("Del Rio Decl."); Declaration of Robert Hall in Support of Plaintiffs' Motion for Summary Judgment, dated May 14, 2012 ("Hall Decl."); Memorandum of Law in Support of Defendants' Cross–Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Permanent Injunction ("Def.

Mem."); Defendants' Reply Memorandum ("Def. Reply Mem."); Defendants' Response to Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ("Def. 56.1"); Declaration of Jonathan Pines in Support of Defendants' Cross–Motion for Summary Judgment, dated April 20, 2012; Declaration of Sandy Brawer in Support of Defendants' Cross–Motion for Summary Judgment, dated April 20, 2012 ("Brawer Decl."); Declaration of Lois Herrera in Support of Defendants' Cross–Motion for Summary Judgment, dated May 12, 2012 ("Herrera Decl."); Declaration of Tom W. Smith in Support of Defendants' Cross–Motion for Summary Judgment, dated May 15, 2012; Supplemental Declaration of Jonathan Pines in Support of Defendants' Cross–Motion for Summary Judgment, dated May 15, 2012; and Supplemental Declaration of Charles Carey in Support of Defendants' Cross–Motion for Summary Judgment, dated May 15, 2012 ("Carey Decl.").

**4.** For a recitation of the facts involving earlier phases of this litigation, see this Court's prior opinions, 400 F.Supp.2d 581, 585–89 (S.D.N.Y.2005) (*"Bronx II "*); 226 F.Supp.2d 401, 403–11 (S.D.N.Y.2002) (*"Bronx I "*). For a discussion of the procedural history that led to Plaintiffs' recent request for a preliminary injunction, *see Bronx III*, 855 F.Supp.2d at 50–51.

location so that [all its members] can fellowship together during ... service[s]," which is "vitally important to the Church's theological beliefs." (*Id.* ¶ 6.) None of the Church's previous meeting locations can accommodate all the Church's current attendees. (*Id.*)

The Board owns and controls 1,197 school facilities in New York City. (Def. 56.1 ¶ 8.) Defendants seek to enforce in full Chancellor's Regulation D–180 ("Ch. Reg. D–180"), which constitutes the Board's policy on granting "extended use" permits to use the Board's schools for activities occurring outside normal school hours and on days when schools are not in session. Ch. Reg. D–180 generally authorizes the use of school facilities for "holding social, civic, and recreational meetings and entertainment, and other uses pertaining to the welfare of the community," provided that "such uses shall be non-exclusive and open to the general public." (*Id.* ¶¶ 11–13.) Section I.Q. of Ch. Reg. D–180 provides that "[n]o permit shall be granted for the purpose of holding religious worship services, or otherwise using a school as a house of worship." [5] (*Id.* ¶¶ 11, 18.) However, the regulation also provides that "[p]ermits may be granted to religious clubs for students that are sponsored by outside organizations and otherwise satisfy the requirements of this regulation on the same basis that they are granted to other clubs for students that are sponsored by outside organizations." (*Id.* ¶¶ 11, 17.) Pursuant to Ch. Reg. D–180, Defendants allow community-based organizations to use the Board's public school facilities after school hours, including week nights, weekends, holidays, and over the summer.

(*Id.* ¶ 12.) Defendants require all permit holders to post a disclaimer on any public notice or other material, including media and the Internet, that states: "This activity is not sponsored or endorsed by the New York City Department of Education or the City of New York." (*Id.* ¶ 25.)

### B. *The Preliminary Injunction*

On February 24, 2012, this Court granted Plaintiffs' motion for a preliminary injunction. The Court found the deprivation of Plaintiffs' First Amendment free exercise rights to constitute irreparable harm. *Bronx III,* 855 F.Supp.2d at 52–53. Regarding Plaintiffs' likelihood of success on the merits, the Court first found that under the Supreme Court's Free Exercise Clause analysis in *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532–33, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), Ch. Reg. D–180 is not neutral both on its face—because it "refers to a religious practice without a secular meaning discernable from the language or context"—and because it "discriminates between those religions that fit the 'ordained' model of formal religious worship services and those religions whose worship practices are far less structured." 855 F.Supp.2d at 54 (internal quotation marks and citations omitted).

Having found the regulation not to be neutral, the Court noted that Ch. Reg. D–180 only passes constitutional muster if it meets a strict scrutiny analysis, meaning Defendants must show the policy serves a compelling state interest and is narrowly tailored to advance that interest. *Id.* at 54–55. The Court then found that Defen-

---

**5.** For simplicity's sake, as well as to be consistent with the parties' apparent preference, going forward this opinion uses the abbreviation "Ch. Reg. D–180" to refer specifically to section I.Q of the regulation. Only section I.Q of Chancellor's Regulation D–180 is being challenged in this litigation. To be clear, this opinion should not be read as invalidating the entire regulation but rather only section I.Q. The Board currently implements the remaining provisions of the regulation without issue and remains free to do so.

dants could not satisfy either prong of the strict scrutiny analysis. First, the Court found that the Board's stated interest in avoiding the perception that it was endorsing religion is not sufficiently compelling because allowing religious worship services in the Board's schools during non-school hours does not violate the Establishment Clause. *Id.* at 55–58. This is particularly true given that the objective observer would "know from the legislative history and implementation of the policy (including the lengthy judicial history) that the Board's actions betoken great effort to *avoid* establishing any religion." *Id.* at 56.

Second, the Court found that Ch. Reg. D–180 does not even advance the Board's stated interest because, in light of the types of religious activities that are expressly permitted in the Board's schools under *Good News Club v. Milford Central School,* 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), *e.g.,* prayer, religious instruction, expression of devotion to God, and the singing of hymns, the policy's ban on religious worship services is ineffective. 855 F.Supp.2d at 59 ("Because the individual elements of [worship] services are expressly permitted, the policy's ban on 'religious worship services' is entirely ineffective in dispelling any confusion in the mind of the objective observer over State endorsement of religion. The Board is just as likely to be perceived as endorsing religion with the ban in place as with it enjoined."). The Court further found that Ch. Reg. D–180 is not narrowly tailored "[b]ecause the Board has not shown that other, less restrictive measures would fail to advance the Board's stated interest." *Id.* at 59.

In addition, based on new evidence regarding how the Board was implementing Ch. Reg. D–180 and the Supreme Court's recent decision in *Hosanna–Tabor Evangelical Lutheran Church & School v. EEOC,* —— U.S. ——, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012), the Court found that the policy violates the Establishment Clause by fostering excessive government entanglement with religion. 855 F.Supp.2d at 59–63. Finally, the Court found that Plaintiffs' Free Exercise Clause and Establishment Clause claims were not procedurally barred. *Id.* at 64–67.

Plaintiffs now seek to convert the February 2012 preliminary injunction into a permanent injunction by way of their motion for summary judgment and reassert that Ch. Reg. D–180 violates their free exercise rights and fosters excessive government entanglement with religion in violation of the Establishment Clause.

Defendants, for their part, reargue that enforcing Ch. Reg. D–180's ban on religious worship services does not violate Plaintiffs' free exercise rights and that enforcing the ban is in fact necessary to avoid violating the Establishment Clause. Defendants also restate that implementation of Ch. Reg. D–180 does not require Defendants to entangle themselves excessively with religion, and therefore the policy does not run afoul of the Establishment Clause.

Having considered the latest evidence and the parties' respective arguments, the Court determines that its reasons for granting Plaintiffs' motion for a preliminary injunction were sound and that implementation of Ch. Reg. D–180 violates both the Free Exercise Clause and the Establishment Clause. Rather than merely repeat here the reasoning set forth in *Bronx III*—which, to be sure, the Court readopts—this opinion primarily addresses why Defendants' latest arguments fail.[6]

---

**6.** The Court here briefly disposes of Defendants' procedural arguments. In support of their cross-motion for summary judgment, Defendants "reassert, and incorporate by ref-

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law governing the suit identifies the essential elements of the claims asserted and therefore indicates whether a fact is material; a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To determine whether a genuine dispute of material fact exists, a court must review the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Lucente v. IBM Corp.,* 310 F.3d 243, 253 (2d Cir.2002). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record...." Fed.R.Civ.P. 56(c)(1)(A). Where, as here, an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated." Fed.R.Civ.P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir.2008). Ultimately, the court must grant summary judgment "if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

## III. DISCUSSION

The Court finds Plaintiffs have satisfied their burden of demonstrating that no genuine dispute as to any material fact exists and that they are entitled to judgment as a matter of law on their Free Exercise Clause and Establishment Clause claims. Each claim is addressed below.

### A. *Ch. Reg. D–180 Violates the Free Exercise Clause*

The Free Exercise Clause of the First Amendment, as applied to the states through the Fourteenth Amendment, provides that "Congress shall make no law ... prohibiting the free exercise [of religion]." U.S. Const. amend. I. "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi,* 508 U.S. at 532, 113 S.Ct. 2217. In *Bronx III,* 855 F.Supp.2d at 53–60, the Court found that Ch. Reg. D–180 unconstitutionally burdens Plaintiffs' free exercise rights under the test laid out in *Lukumi*

---

erence" their arguments presented in opposition to Plaintiffs' motion for a preliminary injunction that Plaintiffs' Free Exercise Clause and Establishment Clause claims are procedurally barred. (Def. Mem. at 33–34.) The Court similarly incorporates by reference the reasons stated in *Bronx III* why the Court disagrees. 855 F.Supp.2d at 64–67. The Court notes that the Court of Appeals apparently disagrees with Defendants' procedural arguments, too. *See Bronx Household of Faith v. Bd. of Educ. of the City of N.Y.,* No. 12–0751, slip op. at 2 (2d Cir. Feb. 29, 2012) ("In the twelfth year of this litigation, the district court has granted a new preliminary injunction adjudicating grounds *previously not addressed.*" (emphasis added)).

because it is not neutral and does not satisfy strict scrutiny. *See Lukumi*, 508 U.S. at 546, 113 S.Ct. 2217 ("A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." (internal quotation marks omitted)); *see also Fifth Ave. Presbyterian Church v. City of N.Y.*, 293 F.3d 570, 574 (2d Cir.2002) ("Government enforcement of laws or policies that substantially burden the exercise of sincerely held religious beliefs is subject to strict scrutiny.").

█ Plaintiffs and *amici curiae* agree with the Court's prior conclusion that Ch. Reg. D–180 is unconstitutional under *Lukumi*. Defendants, on the other hand, raise three primary objections to that conclusion. First, Defendants argue that Ch. Reg. D–180 does not burden, let alone substantially burden, Plaintiffs' free exercise rights. Second, they argue that *Lukumi* and strict scrutiny do not apply to the facts of this case. Instead, they urge the Court to adopt the reasoning of *Locke v. Davey*, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004), under which Defendants say Ch. Reg. D–180 passes constitutional muster. Finally, Defendants argue that even if *Lukumi* applies, Ch. Reg. D–180 withstands strict scrutiny. The Court finds all three objections to be without merit.

### 1. *Ch. Reg. D–180 Burdens Plaintiffs' Free Exercise Rights*

In *Bronx III*, the Court highlighted the burdens on Plaintiffs' free exercise rights that would result from Defendants' implementation of Ch. Reg. D–180. The Court noted:

Plaintiffs claim that because [Ch. Reg. D–180] prevents them from holding Sunday worship services in the Board's public schools—the only location in which they can afford to gather as a full congregation without having to curtail other of their religious practices—it prohibits their free exercise of religion in violation of their First Amendment rights. Plaintiffs assert the prohibitive cost of renting commercial space for the Church's worship services would force them "to reduce and/or eliminate ministries to [the Church's] members and ... local community." "[The] entire congregation could no longer worship together," which would "undermine the fellowship" that is a "vital aspect of [the Church's] religious ministry and calling." Being banned from using the Board's schools would also "undermine [the Church's] ability to engage in the duties of [the Church's] Christian faith—to corporately pray for one another, hear testimony, engage in collective praise, and serve the local community." "In addition, [the Church] will lose some [congregants] because they would not be able to participate in [the Church's] vital Sunday ministry. Many of these individuals are elderly, disabled, or lack transportation, and traveling to another location is not an option."

855 F.Supp.2d at 52 (citations omitted) (all but the first alteration in original). Defendants raise two grounds—one legal and the other factual—for why the foregoing does not constitute any burden on Plaintiffs' free exercise rights.

First, Defendants cite the Court of Appeals' determination that the *predecessor* to Ch. Reg. D–180 did not raise any free exercise concerns to suggest that the current regulation is similarly immune from any free exercise challenge: "[P]laintiffs' rights under the Free Exercise Clause are not burdened because [Ch. Reg. D–180]

does 'not interfere in any way with the free exercise of religion by singling out a particular religion or imposing any disabilities on the basis of religion' ...." (Def. Mem. at 5 (quoting 127 F.3d 207, 216 (2d Cir.1997) (*"Bronx Appeal I"*)).) But this, of course, is no longer true with respect to Ch. Reg. D–180 because the new regulation both discriminates against religion on its face and discriminates among religions. *See Bronx III*, 855 F.Supp.2d at 53–55.

■ Moreover, Plaintiffs' Church has grown considerably since the Court of Appeals decided *Bronx Appeal I*. In this regard, the remainder of the quote that Defendants cite, with all due respect, is stale:

> The members of the Church here are free to practice their religion, albeit in a location separate from [the Board's public schools]. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." That right has not been taken from the members of the Church.

*Bronx Appeal I*, 127 F.3d at 216 (quoting *Emp't Div. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)). This characterization of Ch. Reg. D–180's effect on Plaintiffs' free exercise rights ignores the thrust of *Lukumi* that besides protecting "the right to believe and profess whatever religious doctrine one desires," the Free Exercise Clause also bans government interference with religious "outward physical acts," *Hosanna–Tabor*, 132 S.Ct. at 707, such as the conduct of worship services at issue in this case, *see* 650 F.3d

30, 37 (2d Cir.2011) (*"Bronx Appeal III"*) (defining "worship services" as "a collective *activity* characteristically done according to an order prescribed by and under the auspices of an organized religion, typically but not necessarily *conducted* by an ordained official of the religion" (emphasis added)). Because the unopposed testimony is that P.S. 15 is the *"only* location in which [Plaintiffs] can afford to gather as a *full* congregation without having to curtail other of their religious practices," *Bronx III*, 855 F.Supp.2d at 52–53 (emphasis added), it cannot be gainsaid that Ch. Reg. D–180 burdens Plaintiffs' free exercise rights.[7]

Second, Defendants argue that because Plaintiffs' Church has moved five times since its inception and "has not only survived such relocations, but has grown after each one" and because certain members of the Church own five houses within one block of P.S. 15—"sites that are not only potentially available for the Church's use, but are, in fact, currently being used by [Plaintiffs] for Church-related activities"—enforcing Ch. Reg. D–180 so as to ban the Church from holding its Sunday worship services in the Board's schools will not cause any harm to Plaintiffs. (Def. Mem. at 4.) But this argument ignores the undisputed testimony of Plaintiff Hall that no other location besides P.S. 15 currently facilitates the Church's religious mandate to worship as an *entire* congregation. Furthermore, if forced to worship elsewhere, the Church would have no choice but "to reduce and/or eliminate ministries

---

**7.** Even the Court in *Locke*—which Defendants urge is the more appropriate case to apply on the facts of this litigation, *see infra* Part III. A.2—acknowledged that the challenged law there placed *some* burden on the plaintiff's free exercise rights. *See, e.g., Locke*, 540 U.S. at 725, 124 S.Ct. 1307 ("[T]he exclusion of ... funding [the pursuit of devotional degrees] places a relatively minor burden on [plaintiff]."). If the challenged law in *Locke*, which excluded students who were pursuing a degree in devotional theology from participating in a state scholarship program, at least placed some form of burden—if only a "relatively minor" one—on the free exercise of religion, surely so does Ch. Reg. D–180's ban on religious worship services.

to [the Church's] members and ... local community." *Bronx III*, 855 F.Supp.2d at 52 (alterations in original). And even though the Church is in the process of constructing its own building as a permanent place to hold its worship services, that building is not yet complete. (Pl. Suppl. 56.1 ¶ 6.) As such, and given the uniquely expensive and crowded real estate market in which the Church resides, eviction from the Board's schools would amount to a concrete loss of religious freedom.[8]

Ultimately, given the plain text of Ch. Reg. D–180, the additional fact that the regulation discriminates *among* religions, controlling caselaw regarding what constitutes a burden on the free exercise of religion, and Plaintiff Hall's unopposed testimony that the Church would be forced to curtail its religious practices were it no longer allowed to hold its worship services in P.S. 15, the Court rejects Defendants' argument that Ch. Reg. D–180 places no burden on Plaintiffs' free exercise rights.

### 2. *Lukumi and Strict Scrutiny Apply to Plaintiffs' Free Exercise Clause Claim*

In *Bronx III*, the Court touched upon Defendants' argument that the test in *Lukumi* should not apply on the facts of this case due to the existence here of a competing Establishment Clause concern. The Court noted:

> At oral argument, counsel for Defendants urged that there could be no Free Exercise Clause violation in this case because the cases cited by Plaintiffs in

which the Supreme Court found such violations did not involve a defendant who was motivated by a desire to avoid violating the Establishment Clause. *E.g., Lukumi*, 508 U.S. 520, 113 S.Ct. 2217. Because [Ch. Reg. D–180] results from the Board's balancing of competing constitutional mandates, Defendants argue Plaintiffs' Free Exercise Clause claim is precluded. The Court disagrees. That the Board may need to balance competing interests does not foreclose Plaintiffs' claim but rather speaks to whether [Ch. Reg. D–180] meets strict scrutiny, *i.e.*, whether the Board's interest in adopting the policy is compelling and whether the policy is narrowly tailored to advance that interest.

855 F.Supp.2d at 54 n. 10; *cf. Bronx Appeal III*, 650 F.3d at 59 (Walker, J., dissenting) ("[T]he majority argues that my finding of viewpoint discrimination overlooks the Board's Establishment Clause rationale.... [E]ven if the Board were to have legitimate Establishment Clause concerns, those concerns could do nothing to undermine my conclusion that the Board engaged in viewpoint discrimination; at most, they could only serve as a potential justification for such discrimination." (citation omitted)). Defendants have elaborated on their argument that *Lukumi* is inapplicable for purposes of the pending cross-motions for summary judgment, but the Court remains unpersuaded.

First, Defendants argue that applying *Lukumi*'s strict scrutiny analysis in the

---

**8.** Defendants' attempt to marshal the Church's resources and dictate how those resources should be deployed gives the Court great concern because it suggests that Defendants believe they know best how the Church should conduct its religious affairs. But only Plaintiffs may "decide for themselves, free from state interference, [such] matters of church government as well as those of faith

and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952). Certainly Plaintiffs' assessment of what qualifies as sufficient space to conduct the Church's worship services is an "internal church decision," which is outside Defendants' regulatory authority. *Hosanna–Tabor*, 132 S.Ct. at 706–07.

presence of Defendants' competing Establishment Clause concern would essentially render the Establishment Clause meaningless. Defendants say:

> If plaintiffs' expansive reading of *Lukumi* were to prevail, most government restrictions on religious activity that have been upheld based upon Establishment Clause concerns—for example, the prohibition on prayer in public schools, *see Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962)—would instead have been struck down on free exercise grounds as "non-neutral" to religious expression and exercise. The flaw in this analysis is that, extended to its logical conclusion, the reasoning would find every Establishment Clause concern advanced by the government, necessarily singling out as its concern religious speech and conduct, to be unconstitutionally "non-neutral" and therefore presumptively unconstitutional.

(Def. Mem. at 10.) As an initial matter, the Court notes that Defendants mischaracterize the posture of *Engel*. In that case, the state defendants had adopted a policy "direct[ing] the School District's principal to cause ... [a] prayer to be said aloud by each class in the presence of a teacher at the beginning of each school day." *Engel*, 370 U.S. at 422–23, 82 S.Ct. 1261. The parents of ten students affected by the policy subsequently brought suit alleging that a mandate of prayer in public schools violated the Establishment Clause, *id.* at 423, 82 S.Ct. 1261, and the Supreme Court agreed, *see id.* at 424, 82 S.Ct. 1261 ("We think that by using its public school system to encourage recitation of ...

prayer, the State of New York has adopted a practice wholly inconsistent with the Establishment Clause."). Thus, it was the Supreme Court—not a state actor—that announced the prohibition on prayer in public school. Because no state law involving a "government restriction[ ] on religious activity" was at issue in *Engel*, (Def. Mem. at 10), Defendants' citation thereto does not support their argument. *See also generally Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (finding similar Establishment Clause violation in public school district's inclusion of prayer in its graduation ceremonies).

But even putting aside Defendants' mischaracterization of the posture of the "school prayer" cases, it is important to note that those cases did not involve competing Free Exercise Clause claims. That is, the proponents of the policies that introduced prayer in the public schools did not assert a free exercise justification to counter the Establishment Clause concerns raised by the plaintiffs. Nor could they, as no burden was placed on the free exercise of religion in the absence of the policies that mandated school prayer. The school prayer cases, therefore, stand for the unremarkable proposition that "[t]he principle that government may *accommodate* the free exercise of religion does not supersede the fundamental limitations imposed by the Establishment Clause." *Lee*, 505 U.S. at 587, 112 S.Ct. 2649 (emphasis added).

In the absence of a burden on the free exercise of religion [9] and the presence of a

---

**9.** Because freedom of religion also means freedom from religion, one of the concurrences in *Lee* viewed as coercion the mandatory nature of the graduation ceremonies that included prayer, in violation of the Free Exercise Clause. *See* 505 U.S. at 621, 112 S.Ct. 2649 (Souter, J., concurring) ("[L]aws that coerce nonadherents to support or participate in any religion or its exercise would virtually by definition violate their right to religious free exercise." (internal quotation marks and citation omitted)). Thus, the school prayer cases may be characterized as presenting both Establishment Clause and Free Exercise

concrete Establishment Clause violation, the school prayer cases were relatively simple cases. An entirely different situation is presented here, however, where at issue is not the accommodation of religion but rather the *burdening* of religion, *see supra* Part III.A.1, and where no *actual* Establishment Clause violation is of concern, *see infra* Part III.A.3. In other words, Defendants' argument that applying *Lukumi* to the facts of this case reads the Establishment Clause out of the Constitution is simply not true a concern over an actual violation of the Establishment Clause could certainly justify a burden on the free exercise of religion under *Lukumi*.[10]

Defendants next argue that given the competing interests of Plaintiffs' free exercise rights and Defendants' purported Establishment Clause concern, the Court should decline to apply strict scrutiny based on the reasoning set forth in *Locke*. The plaintiff in that case was a resident of the State of Washington who was awarded a state-funded college scholarship. *See* 540 U.S. at 715–17, 124 S.Ct. 1307. Pursuant to the Washington State Constitution, however, no student who was pursuing a degree in devotional theology could participate in the scholarship program. *Id.* at 716, 124 S.Ct. 1307. The plaintiff, who sought to use his scholarship to pursue a degree in pastoral ministries, brought suit against certain state officials alleging the State's refusal to apply the scholarship towards a degree in devotional theology violated, *inter alia*, his free exercise rights. *Id.* at 718, 124 S.Ct. 1307. The Court of Appeals declared the scholarship program unconstitutional under *Lukumi* because it found that the State had singled out religion for unfavorable treatment, thereby triggering strict scrutiny, and that the State's Establishment Clause concerns were not sufficiently compelling. *Id.*

The Supreme Court reversed, finding that the " 'room for play in the joints' " between the Religion Clauses permitted the scholarship program's challenged exclusion. *Id.* at 718, 124 S.Ct. 1307 (quoting *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 669, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)). "In other words, there are some state actions permitted by the Establishment Clause but not required by the

---

Clause violations on the same side of the coin. This case, in contrast, does not implicate the issue of coercion because Plaintiffs' meetings occur on Sundays (*i.e.*, during non-school hours) and no student is forced to attend them.

**10.** Justice Scalia's dissent in *Locke* addressed a similar argument to the one Defendants put forth here and explained why it is really just form over substance:

Equally unpersuasive is the [majority's] argument that the State may discriminate against theology majors in distributing public benefits because the Establishment Clause and its state counterparts are themselves discriminatory. The [majority's] premise is true at some level of abstraction—the Establishment Clause discriminates against religion by singling it out as the one thing a State may not establish. All this proves is that a State has a compelling

interest in not committing *actual* Establishment Clause violations. We have never inferred from this principle that a State has a constitutionally sufficient interest in discriminating against religion in whatever other context it pleases, so long as it claims some connection, however attenuated, to establishment concerns.

540 U.S. at 730 n. 2, 124 S.Ct. 1307 (Scalia, J., dissenting) (citations omitted). Furthermore—and somewhat ironically—Defendants' position that a state actor requires only a rational basis regarding an antiestablishment concern in order to justify religious discrimination threatens to nullify the *Free Exercise Clause. See id.* ("If religious discrimination required only a rational basis, the Free Exercise Clause would impose no constraints other than those the Constitution already imposes on all government action.").

Free Exercise Clause." *Id.* at 718–19, 124 S.Ct. 1307. The Court held that the Establishment Clause did not require Washington to ban the funding of religious instruction that prepares students for the ministry, even if the Washington State Constitution did. *Id.* at 719, 124 S.Ct. 1307.

Additionally, given Washington's only "mild[ ]" disfavor of religion, *id.* at 720–21, 124 S.Ct. 1307 ("The State has merely chosen not to fund a distinct category of instruction."), and the unique historical concern that most States had "around the time of the founding ... against using tax funds to support the ministry," *id.* at 723, 124 S.Ct. 1307, the Court decided that *Lukumi*'s "presumption of unconstitutionality"—*i.e.*, strict scrutiny—did not apply, *id.* at 725, 124 S.Ct. 1307 ("Given the historic and substantial interest at issue, we therefore cannot conclude that the denial of funding for vocational religious instruction alone is inherently constitutionally suspect."). Having decided not to apply strict scrutiny, the Court upheld the challenged law. *Id.* But the Court also did not articulate the exact test it was applying other than to say the scholarship program's carve-out was permitted by the "play in the joints" between the Religion Clauses. *See id.* at 730, 124 S.Ct. 1307 (Scalia, J., dissenting) ("[T]he [majority's] opinion is devoid of any mention of standard of review....").

■ In light of the facts of this case, the Court rejects Defendants' argument that *Locke* is the more appropriate case to apply. For starters, the Court in *Locke* made clear that the scholarship program at issue was "not a forum for speech" and that consequently the Court's cases dealing with speech forums were "simply inapplicable." *Id.* at 720 n. 3, 124 S.Ct. 1307. Defendants acknowledge as much. (Def. Mem. at 8 n. 4.) In fact, the Court did not

reference a specific category of cases within which *Locke* comfortably fit. Instead, the Court merely characterized the competing claims at issue there as being compatible with the "play in the joints" between the Religion Clauses and, in doing so, did not seem concerned with establishing much precedential value. *See id.* at 725, 124 S.Ct. 1307 ("If any room exists between the two Religion Clauses, it must be here. We need not venture further into this difficult area....")."). Thus, even the *Locke* Court itself intimated that *Locke* is *sui generis.*

In addition, "*Locke* involved neither discrimination among religions nor intrusive determinations regarding contested religious questions." *Colo. Christian Univ. v. Weaver,* 534 F.3d 1245, 1256 (10th Cir. 2008). The same cannot be said here. First, Ch. Reg. D–180's ban on religious worship services "discriminates between those religions that fit the 'ordained' model of formal religious worship services and those religions whose worship practices are far less structured." *Bronx III,* 855 F.Supp.2d at 54–55 (citation omitted). "[L]aws discriminating *among* religions are subject to strict scrutiny." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 339, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). Second, the Board's policy of verifying whether applicants are in fact worshiping in the Board's schools "entail[s] intrusive governmental judgments regarding matters of religious belief and practice," *Colo. Christian Univ.,* 534 F.3d at 1256, in violation of the Establishment Clause, *see infra* Part III.B.

Finally, the counter-interests at play in this case are altogether differently balanced from those at issue in *Locke.* While the *Locke* Court confronted a minimal burden on the free exercise of religion and a substantial and historic antiestablishment

interest, here the Court faces a substantial burden on Plaintiffs' free exercise rights [11] and a misperceived Establishment Clause concern raised by Defendants.[12] Because of this additional fact that the constitutional scales tilt in the opposite direction here than in *Locke,* the Court determines that *Locke* is inapposite.[13] *See Colo. Christian Univ.,* 534 F.3d at 1255–56 ("The Court's ... holding [in *Locke* ] that 'minor burden[s]' and 'milder' forms of 'disfavor' are tolerable in service of 'historic and substantial state interest[s]' implies that major burdens and categorical exclusions from public benefits might not be permitted in service of lesser or less long-established governmental ends." (quoting *Locke,* 540 U.S. at 720, 725, 124 S.Ct. 1307) (all but the first two alterations in original)).

### 3. *Ch. Reg. D–180 Does Not Withstand Strict Scrutiny*

█ Defendants argue that Ch. Reg. D–180 survives even a strict scrutiny analysis. They say the Board's interest in avoiding an Establishment Clause violation has already been deemed compelling by the Court of Appeals and is further supported by the latest evidence adduced in this case. Defendants also say Ch. Reg. D–180 is narrowly tailored to advance the Board's compelling interest. Here, too, the Court disagrees.

#### a) *Defendants Do Not Have a Compelling Interest*

First, contrary to Defendants' reading of *Bronx Appeal III,* the Court of Appeals did not hold that Defendants' stated interest in "seek[ing] to steer clear of violating the Establishment Clause" was compelling for purposes of a strict scrutiny analysis. 650 F.3d at 40. Because the Court of Appeals was conducting a limited public forum free speech analysis, its task was only to determine whether Ch. Reg. D–180's ban on religious worship services was reasonable in light of the purposes served by the forum. While the Court of Appeals

---

**11.** The Court finds that the free exercise burdens Plaintiffs say they would face were Defendants permitted to enforce Ch. Reg. D–180, *see supra* Part III.A.1, are undoubtedly substantial. But even putting aside the qualitative nature of the burdens alleged in this case, the Court agrees with the general proposition that "[t]he indignity of being singled out for special burdens on the basis of one's religious calling [on the face of a statute] is so profound that the concrete harm produced can never be dismissed as insubstantial." *Locke,* 540 U.S. at 731, 124 S.Ct. 1307 (Scalia, J., dissenting). Indeed, as much is implied by *Lukumi's* directive to apply strict scrutiny when presented with a law that is not neutral.

**12.** Furthermore, whereas history was on the state defendant's side in *Locke,* it appears Plaintiffs can lay claim to it here. *See infra* Part III.A.3.

**13.** At oral argument, Defendants took issue with Plaintiffs' suggestion that only an actual Establishment Clause violation could justify *any* burden on the free exercise of religion and cited *Locke* as an example where the Supreme Court tolerated such a burden even in the absence of such a violation. The Court does not dispute Defendants' reading of *Locke* yet fails to see the relevance of Defendants' point. Because the Court did not apply strict scrutiny in *Locke,* the bar was lowered such that the state-defendant was not required to show an actual violation of the Establishment Clause in order to prove the constitutionality of the challenged law. But where there is a greater burden placed on the free exercise of religion such that strict scrutiny does apply, as in this case, the Supreme Court's jurisprudence suggests only an *actual* violation of the Establishment Clause amounts to a compelling interest that could justify so considerable a burden on religion. *Cf., e.g., Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 761–62, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (noting that, in the context of free speech analysis, "compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech").

cited the undisputed proposition that "an interest in avoiding a *violation* of the Establishment Clause 'may be characterized as compelling,'" the reasonableness inquiry at issue did not require it to "decide whether use of the school for worship services would in fact violate the Establishment Clause." *Id.* (emphasis added) (quoting *Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)). And the Court of Appeals did not voluntarily confront that question. *Id.* at 43 ("To reiterate, we do not say that [an Establishment Clause] violation has occurred, or would occur but for the policy."). Instead, it only went so far as to say the Board had a "strong basis to believe that allowing the conduct of religious worship services in schools would give rise to a sufficient appearance of endorsement to constitute a violation of the Establishment Clause." *Id.* at 40. But strict scrutiny requires more than a "strong basis;" it requires a *compelling* interest.

In *Bronx III,* the Court determined that the inquiry into whether Defendants' antiestablishment interest is compelling for purposes of a strict scrutiny analysis required the Court to answer the question that the Court of Appeals declined to entertain—*i.e.,* whether use of the Board's schools for worship services during non-school hours violates the Establishment Clause. 855 F.Supp.2d at 55–56. In answering that question in the negative, the Court readopted its findings from 2002 when it granted Plaintiffs' earlier motion for a preliminary injunction. Those findings included the following: Plaintiffs' Sunday meetings "are obviously not endorsed by the School District;" no school employee attends Plaintiffs' meetings; the meetings are open to all members of the public; children are not present around the school on Sunday mornings; and no student attends the meetings. *Bronx I,* 226 F.Supp.2d at 426. In light of the recent evidentiary record, Defendants say the Court's reliance on its 2002 findings is misplaced. While the Court acknowledges that changed circumstances warrant reconsideration of the Court's prior findings, the latest evidence does not alter the Court's conclusion that Defendants misperceive an Establishment Clause violation.

Turning first to the number of extended use permits, Defendants received 122,874 permit applications for the fiscal year 2011. (Barham Decl. ¶ 25.) The parties have applied different methodologies to discern how many of these permits were granted for the purposes of holding religious worship services; as a result, they have reached different conclusions about the total number of permit applications granted for such purposes. Defendants say the most important figure is that 81 religious organizations obtained permits to hold worship services in the Board's schools for at least three weeks in the fiscal year 2011, up from the 23 that did so when the record previously closed in 2005. (Def. Mem. at 17.) Assuming all these organizations used different school buildings, this would equal 6.77 percent of all the Board's schools. (Barham Decl. ¶ 16.) Plaintiffs, for their part, focus on the percentage of all permits involving religious activity issued to unions and community-based organizations, which they say fluctuates near five percent. (*Id.* ¶ 40.) At the end of the day, however, the parties concur that the gaps in their statistics are not "material enough to really belabor".[14] (Summ. J. Hr'g Tr. at 24.)

**14.** Were the statistical differences material the Court would rely on Plaintiffs' methodology because it provides a more accurate presentation of the data than that of Defendants. Plaintiffs contend that for purposes of classifying the permit applications it is more accu-

Based on these figures, the Court finds that even though more religious organizations are using the Board's schools to hold worship services now than in 2005, the increase is statistically insignificant. Today, close to 95 percent of all permits issued to community-based organizations do not involve religious activity, and the same can be said for the percentage of the Board's public school buildings that are not being used for religious purposes. Furthermore, of the 23 religious organizations that were meeting in the Board's schools in 2005, only seven continued to meet there in 2011. (Geleris Decl. ¶ 8.) At least one of those seven, Lower Manhattan Community Church, has since left the Board's schools. (Holladay Decl. ¶ 7.) Thus, the Court's conclusion in *Bronx II* that "[b]y any measure, the data reflecting the use by religious congregations of schools cannot be deemed dominant"—"either in P.S. 15, in the School District, or in the City"—remains sound. 400 F.Supp.2d at 596.

Defendants next point to the fact that in at least three schools, children and staff from the schools have attended worship services. (Pl. 56.1 ¶¶ 70–71.) [15] But because the Board has opened its limited public forum "for holding social, civic, and recreational meetings and entertainment, and other uses pertaining to the welfare of the community," provided that "such uses shall be non-exclusive and open to the general public," (Def. 56.1 ¶¶ 11–13), this merely reflects the permit holders' efforts to comply with the Board's open use requirement. The Church's Sunday meetings comply with that requirement.[16] And if parents of students choose to exercise their (and their children's) First Amendment rights by attending the Church's services, and school staff do the same, the Court fails to see any impact this would have on the endorsement test analysis under *Lemon v. Kurtzman.* *See* 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (requiring that the "principal or pri-

rate to use the codes assigned by the Board than the varying descriptions provided by the organizations themselves. (Barham Decl. ¶ 9.) The Court agrees. While Defendants contend that the Board's codes do not accurately reflect all the permits they believe are for religious services, (Carey Decl. ¶ 20), the Board's codes provide a more objective and uniform system of classification. Moreover, Defendants make a number of errors in applying their own methodology, which affects 508 of Defendants' entries. (Barham Decl. ¶¶ 7–13.) For example, Defendants include a number of entries that they claimed to exclude. (*See* Carey Decl. Ex. M–2.) In addition, Defendants include in their analysis 100 permits that have not been granted final approval. (*See id.*) By contrast, Plaintiffs exclude any permits without final approval. (Barham Decl. ¶ 32.)

15. In connection with their cross-motion for summary judgment, Defendants re-filed their Rule 56.1 statement from 2005, along with Plaintiffs' responses thereto. Plaintiffs, in turn, filed updated responses to Defendants'

2005 Rule 56.1 statement; Defendants object to their having done so. Putting aside the substantial authority that suggests Plaintiffs' 2005 responses were binding only for purposes of the prior motion for summary judgment they were filed in connection with, the reality is that some of the 2005 responses are no longer true. Defendants cannot dispute this, as even they have responded to Plaintiffs' new Rule 56.1 statement at times in a manner inconsistent with their 2005 responses. In any event, Defendants cannot show that they have been prejudiced by Plaintiffs' updated responses because none of the facts relied upon in this opinion are the product of a "more favorable" updated response.

16. Indeed, the Court of Appeals in *Bronx Appeal III* believed that any form of exclusion would only "aggravate[ ] the potential Establishment Clause problems the Board seeks to avoid." 650 F.3d at 43. Were Plaintiffs to exclude anyone from its Sunday meetings, no doubt Defendants would point to that in support of their antiestablishment interest. Defendants cannot have it both ways.

mary effect [of the law in question] . . . neither advance[ ] nor inhibit[ ] religion"). Certainly there is no evidence that the school staff who attend the meetings are proselytizing to the school's students during the school day. Given the disclaimer all permit holders are required to post on any public notice or other material, stating that "[t]his activity is not sponsored or endorsed by the New York City Department of Education or the City of New York," (Def. 56.1 ¶ 25), not to mention the long history of this litigation, the limited attendance of students and staff cited by Defendants would not alter the objective, fully informed observer's conclusion that "the Board's actions betoken great effort to *avoid* establishing any religion." *Bronx III*, 855 F.Supp.2d at 56.

Finally, Defendants point out that, contrary to the Court's finding in 2002 that there was no evidence children are in the school on Sunday mornings while the Church conducts its services, "sports programs, literacy enrichment programs, test preparation programs, and other activities for children and families have taken place in schools at the same time as religious organizations have held their worship services in the schools." (Def. Mem. at 18.) But this evidence cuts both ways. Defendants cannot argue domination on the one hand—*i.e.*, that the worship services so dominate the schools on Sunday mornings that Defendants' Establishment Clause concern is heightened—and then also point to simultaneous non-worship Sunday activities that involve students to prove the same. The fact that a youth basketball program holds tournaments in a school at the same time that a church holds Sunday services there, both pursuant to a neutral policy that promotes the general welfare of the community, does not suggest to the informed objective observer that the school is endorsing religion just as it does not suggest the school is endorsing basketball.[17] *See Bronx III*, 855 F.Supp.2d at 58–59 ("The objective, fully informed observer who passes by the Board's schools and witnesses a wide variety of community groups meeting on weeknights, followed by a Jewish Friday night service, a Ramadan Saturday evening service, and finally a Sunday morning Christian worship service, could not reasonably infer that the Board was endorsing religion in its public schools. Rather, the informed observer would conclude that the Board opens its schools during non-school hours to a diverse group of organizations pursuant to a neutral policy generally aimed at improving the welfare of the community." (internal quotation marks omitted)).

In short, none of the scant evidence that Defendants point to proves that an Estab-

---

**17.** To the extent Defendants point to the fact that some of the schools where services take place are elementary schools attended by young and impressionable students, such as P.S. 15, to show their Establishment Clause concern is particularly acute, the Supreme Court has already rejected this argument. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 113–19, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) ("[W]hatever significance we may have assigned in the Establishment Clause context to the suggestion that elementary school children are more impressionable than adults, we have never extended our Establishment Clause jurisprudence to foreclose private religious conduct during nonschool hours merely because it takes place on school premises where elementary school children may be present." (citation omitted)); *cf. Gregoire v. Centennial Sch. Dist.*, 907 F.2d 1366, 1381–82 (3d Cir.1990) ("So long as [the school district] maintains a limited student open forum to which outsiders may be invited, it expresses a judgment concerning its students' ability to distinguish neutral access from state sponsorship of the view expressed. [The school district] cannot, therefore, rely on the impressionability of these same students as the basis for content-based exclusions from its facilities in the evening hours or as the basis for an establishment clause defense.").

lishment Clause violation would result but for Ch. Reg. D–180's religious use prohibitions. Instead, the opposite is true. "[V]iewed in its totality by an ordinary, reasonable observer," *Galloway v. Town of Greece*, 681 F.3d 20, 29–31 (2d Cir.2012), a policy that treats neutrally all applicants— religious and secular alike—would not "convey[ ] the view that the [Board] favored or disfavored certain religious beliefs," *id.*[18]

One last consideration deserves mentioning. When considering a law challenged under the First Amendment or assessing a defendant's purported justification for enacting such a law, the Supreme Court has often conducted a historical analysis to gauge how the Framers would have viewed the law or justification at issue. *Compare, e.g., Locke*, 540 U.S. at 725, 124 S.Ct. 1307 (justifying minimal burden on religion in light of state-defendant's historic antiestablishment interest in not funding the religious training of clergy), *with Marsh*, 463 U.S. at 788, 103 S.Ct. 3330 (finding state-funded legislative prayer not *per se* invalid under the Establishment Clause because "[c]learly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment"). Here, history suggests that the Framers

would not have given much credence to Defendants' purported Establishment Clause concern. As *amicus curiae* point out:

> President Washington permitted religious groups to conduct worship services in the U.S. Capitol building as early as 1795. President Jefferson, whose devotion to church-state separation cannot be questioned, regularly attended services in the Capitol throughout his presidency, and allowed worship services in the Treasury and War Office buildings as well. Even the Supreme Court chamber was occasionally used for worship services. Mr. Jefferson later invited religious societies, under "impartial regulations," to conduct "religious exercises" in rooms at his beloved University of Virginia, for the benefit of students who wished to attend. He specifically observed that these arrangements would "leave inviolate the constitutional freedom of religion."

(Becket Mem. at 10–11 (citations omitted) (quoting 19 *The Writings of Thomas Jefferson* at 414–17 (Memorial ed. 1904)).) Thus, contrary to the situation in *Locke*, Defendants' stated Establishment Clause concern is in fact contradicted by history.

Given all the above considerations, it is unsurprising that Defendants cite no case—and the Court is aware of none—in

---

**18.** In *Bronx Appeal III*, the Court of Appeals found that "the fact that school facilities are principally available for public use on Sundays results in an unintended bias in favor of Christian religions." 650 F.3d at 43. This factored into the Court of Appeals' conclusion that the Board's Establishment Clause concern was reasonable. Now that the Court is tackling the question of whether the Board's antiestablishment interest is compelling, on this point the Court notes the Supreme Court's conclusion in *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), that the mere fact "a clergyman of

only one denomination—Presbyterian—has been selected for 16 years" as a state legislative chaplain does not "in itself" violate the Establishment Clause. *Id.* at 793–94, 103 S.Ct. 3330. The Court rejected the argument that such a long tenure had "the effect of giving preference to his religious views," absent proof that the chaplain's reappointment "stemmed from an impermissible motive." *Id.* at 793, 103 S.Ct. 3330. Thus, even if the Board's schools lend themselves to being available more frequently for religions that hold worship services over the weekend, based on *Marsh*, this fact alone does not violate the Establishment Clause.

which a court has struck down a public school board's policy of permitting religious worship during non-school hours as violative of the Establishment Clause. At the same, there is authority to the contrary. *See Fairfax Covenant Church v. Fairfax Cnty. Sch. Bd.*, 17 F.3d 703, 706–08 (4th Cir.1994); *Gregoire*, 907 F.2d at 1379–81. The Court agrees with those other courts that have directly confronted the merits of Defendants' constitutional concern and concluded that a school board does not violate the Establishment Clause by permitting religious organizations to hold worship services during non-school hours. Accordingly, for the reasons stated above, as well as those stated in *Bronx II*, 400 F.Supp.2d at 592–98, and *Bronx III*, 855 F.Supp.2d at 55–58, the Court concludes that Defendants' purported antiestablishment interest is not compelling and that, as a result, Ch. Reg. D–180 fails to satisfy the first prong of *Lukumi*'s strict scrutiny analysis. Ch. Reg. D–180 thus violates the Free Exercise Clause, and the Court grants Plaintiffs' motion for summary judgment on this ground.

### b) *Ch. Reg. D–180 Does Not Advance Board's Antiestablishment Interest*

The Court concluded in *Bronx III* that Ch. Reg. D–180 also fails the second prong of *Lukumi*'s strict scrutiny analysis in that it does not advance the Board's stated antiestablishment interest and is not narrowly tailored to advance that interest. 855 F.Supp.2d at 57–60. The Court briefly elaborates here on the first part of that conclusion.

To begin, the Court previously found that "[b]ecause [Ch. Reg. D–180] singles out only those religions that conduct 'ordained' worship services, the ban works against the informed observer's perception of neutrality that would otherwise result if all religions were treated on the same terms." *Id.* at 58. Defendants now assert that "[t]aken together, ... the two provisions of Ch. Reg. D–180, § I.Q—the 'religious worship services' provision and the 'house of worship' provision—reach all forms of worship, whether practiced by ordained religions or those with less formal worship practices." (Def. Reply Mem. at 3.) The Court finds two fundamental flaws with Defendants' assertion.

First, the Court does not see how Defendants can possibly prove their assertion that "the two provisions of Ch. Reg. D–180 ... reach all forms of worship" in light of their refusal to define either provision. The Court of Appeals has undertaken to define "religious worship services" as "a collective activity characteristically done according to an order prescribed by and under the auspices of an organized religion, typically but not necessarily conducted by an ordained official of the religion." *Bronx Appeal III*, 650 F.3d at 37. In the absence of any guidance or objection from Defendants, this Court has proceeded to analyze Plaintiffs' pending claims with that definition in mind. However, because the Court of Appeals declined to consider the reach of the "house of worship" prong, it did not attempt to define that term. *Id.* at 36 & n. 6. Because Defendants continue to refuse to define it as well, this Court cannot competently assess the merits of their argument that both worship-related prongs of Ch. Reg. D–180 work together to treat all religions equally. As such, the Court is left to analyze the "religious worship services" prong alone. Based on the Court of Appeals' definition of that term, this Court reaffirms its conclusion in *Bronx III* that Ch. Reg. D–180 is ineffective in advancing the Board's antiestablishment interest because the regulation dis-

criminates among religions.[19]

Second, the report submitted by Plaintiffs' expert, Gerard R. McDermott, demonstrates the practical impossibility that Ch. Reg. D–180 treats all religions equally. Many non-theistic religions exist that do not "worship." (Lorence Decl. Ex. 32, at 16–20.) For example, Theravada Buddhists do not worship or participate in worship services but they do hold "meetings in which believers teach and learn and meditate and chant." (*Id.* Ex. 32, at 18.) These religious adherents therefore would not be excluded from the Board's schools under Ch. Reg. D–180, whereas followers of an "ordained" religion would be excluded. Thus, the dual worship-related provisions are not comprehensive and neutral; rather, they treat certain religions differently from others. Furthermore, because the Board relies in the first instance on the religious applicants themselves to determine whether their proposed uses are prohibited under the regulation, Ch. Reg. D–180 would allow the very same activities on behalf of one church that does not consider them to be worship that it would prohibit on behalf of another church that does view them as worship. The end result, as Defendants admit, is that some religious applicants "will fall through th[e] net." (Summ. J. Hr'g Tr. at 48.) For these additional reasons, the Court remains convinced that Ch. Reg. D–180 is ineffective in advancing Defendants' antiestablishment interest.

In *Bronx III*, the Court noted that Ch. Reg. D–180's ineffectiveness is also evidenced by the fact that student religious clubs conduct the constituent activities of a worship service that would otherwise be banned under the regulation:

> Given the variety of religious practices that are permitted under [Ch. Reg. D–180]—as to which the Board makes clear there is no endorsement of religion—the Board fails to explain how the informed observer would view any differently the Board's permitting Plaintiffs' use of its schools for Sunday worship services. Because the individual elements of those services are expressly permitted, the policy's ban on "religious worship services" is entirely ineffective in dispelling any confusion in the mind of the objective observer over State endorsement of religion. The Board is just as likely to be perceived as endorsing religion with the ban in place as with it enjoined. In both instances, the observer would see "[p]rayer, religious instruction, expression of devotion to God, and the singing of hymns." Whether the applicant or a Board bureaucrat deems those activities to constitute "worship services" or not does not change the objective observer's perception of whether or not the Board is endorsing religion.

855 F.Supp.2d at 59 (quoting *Bronx Appeal III*, 650 F.3d at 36–37). New insight into how religious student clubs operate in

---

**19.** Defendants' failure to define the term "house of worship" presents an additional problem. Under *Good News Club*, the Board may not exclude from its schools organizations who wish to conduct activities such as prayer, religious instruction, expression of devotion to God, and the singing of hymns; to do so would encroach impermissibly on their free speech rights. *See Bronx Appeal III*, 650 F.3d at 36–37. Yet the vagueness of Ch. Reg. D–180's religious use ban coupled with the regulation's certification requirement, *see in-* fra Part III.B, threatens to keep certain organizations out of the Board's schools for exactly these types of activities. Defendants admit that if a religious organization considered, for example, the singing of hymns to be barred under the Board's ban on using its schools as a "house of worship," that organization could be precluded from fully exercising its free speech rights. (*See* Summ. J. Hr'g Tr. at 52–53.) The Court finds this risk to be all too real and unacceptable.

the Board's schools buttresses the Court's prior discussion on this issue.

The typical meeting of one such student-led religious club—Seeker Christian Fellowship—occurs either right before or after the school day. (Del Rio Decl. ¶ 2.)[20] Anywhere from a few students to over one hundred students attend meetings. (*Id.* ¶ 9.) The meetings occur weekly, usually last thirty minutes or less, and "consist of prayer, singing, study of the Bilbe and students discussing with each other their Christian beliefs." (*Id.*) A faculty advisor is present during the meetings but does not participate in them. (*Id.* ¶ 8.) All students are invited to attend the meetings, which occur in "rooms where students are walking by and can note the fact that the Christian meetings are taking place." (*Id.* ¶ 10.) "[S]tudents from other religious faiths conduct[ ] meetings in the New York City public schools right before, after, or during the school day, including Muslim, Jewish, and other religious student groups." (*Id.* ¶ 12.)

Defendants argue that the student-led religious clubs do not raise the same Establishment Clause concerns as do Plaintiffs' meetings. In fact, Defendants go so far as to say "the requirements under which student groups operate insure that there is virtually no likelihood that students, or members of the public, will discern a message of endorsement on the part of [the Board]." (Def. Reply Mem. at 13.) Given the functionally similar restrictions under which both types of meetings operate, the Court rejects Defendants' position that students and members of the public would interpret so differently the Board's message of endorsement with respect to the activities of Plaintiffs' meet-ings versus those of student-led religious clubs.

For example, Defendants point to the fact that student clubs only advertise their meetings within the school whereas Plaintiffs are free to advertise their meetings outside the school community. But given the size of the respective environments, the Court fails to see the significance of this distinction. In fact, a student-led religious club's advertisement on a bulletin board or over the school's public address announcement system, (*see* Herrera Decl. ¶ 12), is more likely to be noticed by a greater percentage of people within the school than is Plaintiff's announcement of its meetings by the eight million plus inhabitants of New York City or the seemingly infinite number of users surfing the Web. Defendants also say "[s]ome congregations have more than 100 people in attendance at their services," (Def. Reply Mem. at 13), but the same can be said for certain student club meetings, (Del Rio Decl. ¶ 9).

But perhaps most telling is the fact that student-led religious clubs, even though they meet during non-instructional time, hold their meetings on school days when significantly more students are present than on Sundays (when Plaintiffs' meetings take place). This suggests the likelihood that a student or parent would misperceive that the Board was endorsing the club's religious activities is greater than the likelihood either would have the same misperception regarding Plaintiffs' Sunday meetings. In this regard, the Court agrees with Plaintiffs' counsel's comment at oral argument that "high school students may

---

**20.** Defendants object to the Del Rio declaration as based purely on inadmissible hearsay. But the declaration makes clear that it is based upon the declarant's personal knowledge. (Del Rio Decl. ¶ 1.) Furthermore, De-fendants themselves have filed declarations in support of their cross-motion for summary judgment that are littered with objectionable hearsay. The Court therefore rejects Defendants' objection.

not have the benefit of reading the Second Circuit's decision [in *Bronx Appeal III*] and [may] not be able to parse between a worship service and [the activities of a student-led religious club]. They're going to see a lot of worship-like activity going on by their peers, permitted by the public school officials." (Summ. J. Hr'g Tr. at 25.) Of course, the endorsement test looks to the objective, fully informed observer's perception as determinative of whether there is an actual Establishment Clause violation. But the fact that the risk of confusion by the uninformed regarding endorsement is greater with respect to the activities of student-led religious clubs than it is with respect to Plaintiff's Sunday meetings highlights the ineffectiveness of Ch. Reg. D–180 in advancing the Board's stated antiestablishment interest.[21]

Accordingly, the Court rejects Defendants' argument that Ch. Reg. D–180 is effective in advancing their antiestablishment interest.[22] Because the Court finds to the contrary—*i.e.*, that the regulation does *not* advance the Board's interest— Ch. Reg. D–180 also fails the second prong of *Lukumi*'s strict scrutiny analysis.

Ch. Reg. D–180 thus violates the Free Exercise Clause for this additional reason.

### B. *Ch. Reg. D–180 Also Violates the Establishment Clause*

■ The Court additionally based its February 2012 preliminary injunction on post-*Bronx Appeal III* factual and legal developments, which the Court found warranted reconsideration of Plaintiffs' Establishment Clause claim. *See Bronx III*, 855 F.Supp.2d at 59–64. Specifically, the Court found that Ch. Reg. D–180 violates the Establishment Clause under *Lemon* because it causes the Board's officials to become excessively entangled with religion by requiring them to make their own bureaucratic determinations as to what constitutes "worship." The Court also found that the Supreme Court's recent decision in *Hosanna–Tabor* confirms that the Establishment Clause "prohibits government involvement in such ecclesiastical decisions." 132 S.Ct. at 706. At oral argument on Plaintiffs' motion for a preliminary injunction, Defendants provided a rough sketch of the verification procedure

---

**21.** Putting the activities of student-led religious clubs aside, Ch. Reg. D–180—which relies on the subjective labels applicants use to describe their religious practices—is ineffective in countering the perception of establishment because observers still see outside groups conducting the constituent parts of a worship service in the Board's schools. *See Bronx III*, 855 F.Supp.2d at 59.

**22.** Defendants argued for the first time at oral argument that the effectiveness of Ch. Reg. D–180's ban on "religious worship services" and otherwise using the Board's schools as a "house of worship" is evidenced by the fact that, prior to this Court's issuing its preliminary injunction, some organizations that had previously been meeting in the schools either vacated them or were planning to leave upon learning that the Board would begin enforcing the regulation in February 2012. While Defendants did not elaborate on this argument, the gist appears to be that because

religious organizations were leaving the schools entirely and not remaining to conduct the individual elements of worship permitted under *Good News Club*, the schools were trending towards being entirely "religious free," thus demonstrating the effectiveness of Board's policy. Because Defendants did not raise this argument until the eleventh hour and failed to submit a declaration detailing the number of religious organizations that previously obtained permits to conduct the types of activities expressly permitted under *Good News Club* but which decided to leave the schools after being informed that worship services would no longer be allowed, the Court cannot address the merits of Defendants' argument. Furthermore, the Cole declaration contradicts Defendants' assertion. *See infra* Part III.B. Therefore, Defendants' unsupported argument does not factor into the Court's analysis.

for determining applicants' compliance with Ch. Reg. D–180's worship-related provisions; Defendants were unsuccessful in convincing the Court of the constitutionality of that procedure. Defendants have now sought to explain in greater detail their current verification method and why it does not cause excessive government entanglement with religion, but the Court remains unconvinced.

In *Bronx III*, the Court cited the testimony of a permit applicant who sought the Board's guidance whether his church's proposed activities would be permitted under Ch. Reg. D–180. The applicant provided the Board with descriptions of his church's meetings, and the Board ultimately determined that the meetings constituted impermissible "religious worship services" under the regulation. The Court concluded the following:

> The declarations recently filed in this case ... demonstrate that the Board does not engage in a mere act of inspection of religious conduct when enforcing [Ch. Reg. D–180]. Rather, the Board has evidenced a willingness to decide for itself which religious practices rise to the level of worship services and which do not, thereby causing the government's entanglement with religion to become excessive.

*Bronx III*, 855 F.Supp.2d at 63–64 (internal quotation marks omitted). The Board's excessive entanglement with religion is further evidenced by the declaration of Marilynn N. Cole ("Cole"), submitted in support of Plaintiffs' motion for summary judgment.

Cole serves as an elder for Unbroken Chain Church, a Christian church that currently meets on Sunday mornings for its "main worship service" in one of the Board's schools. (Cole Decl. ¶ 3.) When Cole learned of the Board's intention to begin enforcing Ch. Reg. D–180's ban on religious worship services after February 12, 2012, she called a Board official to see whether her church's weekly Wednesday night prayer meeting and weekly Friday night Bible study would also be prohibited. (*Id.* ¶¶ 7–8.) The Board official told Cole to "write him an email describing what [the church does] at those meetings." (*Id.* ¶ 8.) Cole explained in a subsequent email that "Wednesday night is Prayer ... and congregation members come to the front to share their requests. And then they pray. Our Bible Study is teaching from our Pastor or from one of our elders or ministers." (*Id.* (alteration in original).) The Board official eventually answered Cole's inquiry by stating that "Bible study would be ok, but not prayer meetings." (*Id.* ¶ 10.) Cole's unopposed declaration reaffirms the Court's conclusion that "the Board has evidenced a willingness to decide for itself which religious practices rise to the level of worship services and which do not, thereby causing the government's entanglement with religion to become excessive." *Bronx III*, 855 F.Supp.2d at 63.

Defendants, for their part, admit that some Board officials made mistakes in following the Board's protocol for verifying compliance with Ch. Reg. D–180. (*See, e.g.,* Brawer Decl. ¶ 32.) But Defendants insist the Board's method of implementing Ch. Reg. D–180 is constitutionally sound because it first looks to the religious applicants themselves to certify whether they intend to use the schools for "religious worship services" or as a "house of worship." Defendants summarize the Board's verification procedure as follows:

> Staff will rely, in the first instance, upon the representations of religious organization applicants regarding their compliance with the worship-related provisions of [Ch. Reg. D–180], but reserve the right to look to other sources of publicly available information to verify appli-

cants' representations made on permit forms, just as staff do with non-religious applicants.

(Def. Reply Mem. at 8; *see also* Brawer Decl. ¶¶ 20–21, 47.) While this approach of "look[ing] beyond the four corners of the Extended Use Application," (Brawer Decl. ¶ 20), may be proper for purposes of verifying a political or commercial applicant's compliance with Ch. Reg. D–180, the same cannot be said of verifying whether a religious applicant is complying with the worship-related provisions of the regulation. This is because it is the religious adherents alone who can determine for themselves how to "shape [their] own faith," *Hosanna–Tabor*, 132 S.Ct. at 706, and no amount of bureaucratic second-guessing—even if based solely on the adherents' own words—may invade their province.[23]

The following colloquy at oral argument highlights the problem of excessive entanglement that results from Defendants' verification process:

> COURT: If there is no definition in [Ch. Reg. D–180] of [religious] worship service or … house of worship, how can the regulation be enforced and how will folks know whether they are in or out? DEFENDANTS: Well, your Honor, the plaintiffs themselves in their 56.1 statement make that argument for us, because they say it is only the religious worshiper who knows what worship is…. *The definition [of "religious worship services" or "house of worship"] is what the religious organization believes it to be.*

(Summ. J. Hr'g Tr. at 44–45, 60 (emphasis added).) If it is true that only a religious organization can define for itself what it means to conduct "religious worship services" or to use a building as a "house of worship," it is equally true that an outsider has no insight into whether that organization is acting consistently with its own religious beliefs. Defendants' attempts to do so in this case only serve to illustrate the constitutional impropriety of such a task.

For example, Defendants point to a religious applicant's use of the word "worship" in public documents and statements as a red flag that the applicant may have deceitfully certified compliance with Ch. Reg. D–180. (*See, e.g.,* Def. Mem. at 27 ("[N]otwithstanding plaintiffs' varying approaches to Ch. Reg. D–180 and purported difficulty with the regulation's use of the word 'worship,' their use of the word when facing the larger community is remarkably clear and straightforward. Hall testified that the Church has consistently distributed flyers to the public over ten years, inviting the community 'to worship with them Sunday at 11:00 AM' at P.S.15.").) Defendants seem to be conflating "worship" with "religious worship services," *see Bronx Appeal III*, 650 F.3d at 37 ("The 'religious worship services' clause does not purport to prohibit use of the facility by a person or group of persons for 'worship.'"), but in any event they are excessively entangling themselves in religious matters. Because Defendants do not define either term, a religious organization may, according to its religious beliefs, honestly certify on a permit application that it will not use the Board's schools for "religious worship services" or as a "house of worship" yet nevertheless conduct some other form of "worship" not proscribed by Ch. Reg. D–

---

**23.** The fact that Defendants may investigate a political or commercial applicant's public statements to confirm compliance with Ch. Reg. D–180 is irrelevant. Whereas specific First Amendment prohibitions on state action are implicated when a religious adherent applies for an extended use permit under Ch. Reg. D–180, no such constitutional limitations are triggered when Board officials review a politician's or a merchant's application.

180. As Brad Hertzog, Pastor of Reformation Presbyterian Church, points out:

> From my theological perspective, the Bible gives us a taxonomy of worship that includes different angles on this word. For example, there is a sense (from the Bible) that everything the Christian does is worship—including eating and drinking.... There is another aspect of worship which includes certain things that are more particularly set apart for God. For example, prayer can rightly be called worship, because it is an act of worship.

(Hertzog Decl. ¶ 11.)

Assuming Pastor Hertzog applied for an extended use permit for his congregation to hold Bible study meetings, certified that he was in compliance with Ch. Reg. D–180, and then distributed a leaflet that said, "Come worship the Bible with us Sunday mornings in P.S. 173," Defendants say they would be justified in revoking his permit for certifying his application falsely. (*See* Summ. J. Hr'g Tr. at 40 ("Well, you look at [the applicant's] leaflet. It says come worship with us. It sounds like worship to me. You don't have to go much further than that.").) But that would only mean the Board is substituting its own understanding of the congregation's faith for that of the congregation itself—even if the Board's officials only look to the congregants' own words—in clear violation of both the Establishment Clause (excessive entanglement) and the Free Exercise Clause (government interference with an internal church decision).[24] Indeed, the Board's inquiry into the applicant's religious views alone suffices to violate Plaintiffs' First Amendment rights. *See NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 502, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) ("It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."); *Bronx Appeal I*, 127 F.3d at 221–22 (Cabranes, J., dissenting in part) ("There may be cases in which the parties dispute whether or not a proposed activity for which permission to use school premises is denied actually constitutes religious instruction or worship, and the very act of making such classifications may deeply-and unconstitutionally-entangle public officials in essentially theological determinations."); *Colo. Christian Univ.*, 534 F.3d at 1261 ("Properly understood, the [excessive entanglement] doctrine protects religious institutions from governmental monitoring or second-guessing of their religious beliefs and practices....").

The Court further finds the excessive government entanglement with religion that Ch. Reg. D–180 fosters to be congruent with that found by the court in *Faith Center Church Evangelistic Ministries v. Glover*, 2009 WL 1765974 (N.D.Cal. June 19, 2009). In that case, the plaintiff was a non-profit religious organization that challenged a county library policy that generally opened the library's meeting room "for educational, cultural, and community related meetings, programs, and activities" but prohibited the use of the room for "religious services." *Id.* at *1.

---

**24.** Quaker "meeting for worship," in which attendees sit in communal silence and speak only when (and if) the "Holy Spirit" so moves them, presents a similar problem. A Quaker organization that applies for an extended use permit may certify compliance with Ch. Reg. D–180 because it does not consider its meetings to qualify under either of the regulation's worship-related provisions. Nevertheless, were the Board's officials to visit the organization's website and see the advertisement, "Come join our meeting for worship at P.S. 90 on Saturdays," Defendants say they would be justified in deeming the organization to have falsely certified its permit application. The Religion Clauses say otherwise.

The plaintiff had initially won a preliminary injunction against enforcement of the policy on free speech grounds. After the Court of Appeals for the Ninth Circuit reversed that ruling in part, *see* 480 F.3d 891, 918 (9th Cir.2007) ("[P]rohibiting Faith Center's religious worship services from the [library] meeting room is a permissible exclusion of a category of speech that is meant to preserve the purpose behind the limited public forum. Religious worship services can be distinguished from other forms of religious speech by the adherents themselves."), the plaintiff submitted a new application to use the library meeting room for "Prayer, Praise Wordshop [sic] Purpose to Teach Scripture and Encourage Salvation thru Jesus to Build–Up this Community Overall." 2009 WL 1765974, at *3. A county official approved the application but clarified that the plaintiff could use the library's meeting room "for any activity that does not violate the meeting room use policy including activities that express a religious viewpoint. In accordance with the Ninth Circuit's holding, *you* are responsible for distinguishing religious worship services from other forms of religious speech." *Id.* (emphasis added). In response, the plaintiff's "leader" argued:

> "[I]t is impossible for [her] to distinguish between worship and any other aspect of Faith Center's meetings," because she understands "worship to be an outward expression of a relationship with God," and "any time [she is] doing something that is in accordance with what God would like [her] to do, that is an act of worship."

*Id.* at *4 (all but the first alteration in original).

The parties cross-moved for summary judgment, and the court first concluded that the religious use restriction did not violate the Free Speech Clause. *See id.* at *4–7. However, it found that the religious use restriction did violate the Establishment Clause based on the policy's fostering of excessive government entanglement.[25] The court noted:

> [T]he County has not defined what it means by "religious services." The County contends that the Library relies only on the applications to determine whether an event would fall within the scope of the Religious Use restriction. However, the record demonstrates that if there are questions about whether activities are religious services, rather than other religious activities permitted in the Meeting Room, someone from the County reviews the application to make that determination.
>
> Indeed [there is] the likelihood that the County would be called upon to inquire into religious doctrine in order to determine whether a particular activity qualified as a religious service.

*Id.* at *9 (citations omitted). The same is true here.

First, the Board has refused to define the terms "religious worship services" and "house of worship." Second, the declarations filed in this case demonstrate that Board officials have reviewed permit applications to make the determination whether the applicant's proposed activities constitute these types of prohibited reli-

25. The Court notes that the procedural posture of *Faith Center Church* is also on par with this litigation's procedural history. That the Court of Appeals in that case reversed the district court's ruling on the plaintiff's Free Speech Clause claim did not prevent the district court from finding in the plaintiff's favor on its Establishment Clause claim. The same can be said here: the Court of Appeals' rejection of Plaintiffs' Free Speech Clause claim does not preclude this Court from granting Plaintiffs' requested relief on its Establishment Clause and Free Exercise Clause claims.

gious use. Third, even though Board officials look to the applicants in the first instance to decide whether their proposed activities fall within the proscribed worship-related provisions, the Board's verification method requires state officials to "inquire into religious doctrine"—as discussed above, because only the religious adherents themselves may shape their own faith, an outsider's interpretation of the adherents' own statements regarding their religious practices "does not lie within the [government's regulatory] competence to administer." *Widmar v. Vincent*, 454 U.S. 263, 269 n. 6, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).

Accordingly, for all these reasons, the Court concludes that Ch. Reg. D–180 "call[s] for official and continuing surveillance leading to an impermissible degree of [government] entanglement" with religion, in violation of the Establishment Clause. *Walz*, 397 U.S. at 675, 90 S.Ct. 1409. Defendants are not immune from excessive entanglement once they begin to verify the qualitative nature of specific religious practices.[26] The Court thus grants Plaintiffs' motion for summary judgment on this additional ground.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment [Dkt. No. 148] is GRANTED, and Defendants' cross-motion for summary judgment [Dkt. No. 158] is DENIED. Defendants are permanently enjoined from enforcing Ch. Reg.

D–180 so as to deny Plaintiffs' application or the application of any similarly-situated individual or entity to rent space in the Board's public schools for meetings that include religious worship.[27]

SO ORDERED.

---

**26.** Defendants even seemed to recognize as much at oral argument. (*See* Summ. J. Hr'g Tr. at 39 ("I think we sketched out—I mean, look, the plaintiffs have cited some e-mails or other communication[s] that said, you know, tell me in detail everything you're doing. I'm not going to say that was what we intended that they do. *Rolling out a policy of this difficulty to 1500 schools, you may find somebody asking questions that might not be the way you would want to frame them."* (emphasis added)).)

**27.** The Court incorporates by reference the reasons why the preliminary injunction extended to any similarly-situated party as Plaintiffs. *See Bronx III*, 855 F.Supp.2d at 67 n. 17. The same reasons apply for purposes of this permanent injunction.