Judge WALKER dissents by separate opinion.
LEVAL, Circuit Judge:
This appeal raises the question whether the Board of Education of The City of New York (the “Board”),[1] in making the City’s school facilities available outside of school hours for use by outside users and subsidizing such use, may, in furtherance of interests favored by the Establishment Clause of the First Amendment, refuse to permit the holding of religious worship services. The United States District Court for the Southern District of New York (Preska, C.J.) concluded that the Free Exercise and Establishment Clauses of the First Amendment compel the Board to allow outside users to conduct religious worship services in the school facilities and enjoined the Board from enforcing its prohibition. We conclude that the Board’s prohibition was consistent with its constitutional duties. We therefore vacate the injunction imposed by the District Court and reverse its judgment.
The Board and co-defendant Community School District No. 10 appeal from the District Court’s grant of summary judgment permanently enjoining Defendants from enforcing Chancellor’s Regulation D-180 § I.Q. (“Reg.I.Q.”) against Plaintiffs, The Bronx Household of Faith (“Bronx Household”) and its pastors Robert Hall and Jack Roberts. Regulation D-180 governs the “extended use” of school facilities (the term refers to the use of school facilities outside of school hours by outside organizations and individuals).[2] Extended use, which requires a permit issued by the Board, is subsidized in that no rent is charged for use of the school facilities.[3] Reg. I.Q. provides: “No permit shall be *188 granted for the purpose of holding religious worship services, or otherwise using a school as a house of worship.”[4]
The District Court found that enforcement of Reg. I.Q. to exclude religious worship services would violate the Free Exercise and Establishment Clauses. We disagree. We conclude Reg. I.Q. is constitutional in light of the Board’s reasonable concern to observe interests favored by the Establishment Clause and avoid the risk of liability under that clause. Accordingly, we vacate the injunction and reverse the District Court’s judgment.
BACKGROUND
We assume familiarity with the facts and procedural history of this long-running litigation, as set forth in our prior opinions, and we recount them here only as necessary to explain our disposition of this appeal. See Bronx Household of Faith v. Bd. of Educ. of City of New York, 650 F.3d 30 (2d Cir.2011) (“Bronx Household IV”); Bronx Household of Faith v. Bd. of Educ. of City of New York, 492 F.3d 89 (2d Cir.2007) (“Bronx Household III”); Bronx Household of Faith v. Bd. of Educ. of City of New York, 331 F.3d 342 (2d Cir.2003); Bronx Household of Faith v. Cmty. Sch. Dist. No. 10, 127 F.3d 207 (2d Cir.1997).
In July 2007, the Board adopted Reg. I.Q. (then designated Standard Operating Procedure § 5.11). On November 2, 2007, in litigation resulting from the Board’s denial of Bronx Household’s application for a permit to use school facilities for “Christian worship services,” the district court permanently enjoined the Board from enforcing the rule. Bronx Household IV, 650 F.3d at 35; Bronx Household of Faith v. Bd. of Educ. of City of New York, No. 01 Civ. 8598, 2007 WL 7946842, at *1 (S.D.N.Y. Nov. 2, 2007). The District Court’s ruling was predicated on its conclusion that the rule constituted an unconstitutional viewpoint discrimination against religion and as such was forbidden by Good News Club v. Milford Cent. Sch., 533 U.S. 98, 111-12, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001), in which the Supreme Court found that a school’s refusal to permit a Christian children’s club to meet at the school outside of school hours because of the club’s religious nature constituted viewpoint discrimination and violated the club’s free speech rights. See Bronx Household of Faith v. Bd. of Educ. of City of New York, 400 F.Supp.2d 581 (S.D.N.Y. 2005).
On appeal, we reversed the District Court’s judgment and vacated the injunction. Bronx Household IV, 650 F.3d at 51. (We incorporate that opinion into this one by reference as several of the issues we there discussed are pertinent to the present appeal.) Noting the “important difference between excluding the conduct of an *189 event or activity that includes expression of a point of view, and excluding the expression of that point of view,” we observed that, unlike the rule imposed by the school in Good News Club, the Board’s rale barring the conduct of religious worship services placed no restriction on the use of school facilities by religious groups to teach religion, sing hymns, recite prayers, and express or advocate their religious point of view. Id. at 37-38. The rule prohibiting religious worship services therefore did not exclude expression of a religious viewpoint. It was a content-based exclusion of a particular category of activity, which exclusion was constitutionally permissible in light of the Board’s reasonable and good faith belief that permitting religious worship services in its schools might give rise to an appearance of endorsement in violation of the Establishment Clause, thus exposing the Board to a substantial risk of liability.[5] Id. at 43.
We also rejected Bronx Household’s claim that the rule violated the Establishment Clause. Id. at 45-48. We found no basis for Bronx Household’s contention that the rule was motivated by hostility to religion. Id. at 46. Nor would a reasonable observer perceive the rule as an expression of such hostility in light of the range of religious activity the rale permitted and in light of the reasonableness of the imposition of the rule to guard against being found in violation of the Establishment Clause. Id. at 45-46. Finally, we rejected Bronx Household’s claim that the Board would become excessively entangled in religious matters in undertaking to determine whether an applicant’s proposed activities constituted a religious worship service. Id. at 46-48. In the first place, Bronx Household had expressly applied to conduct “Christian worship services.” Moreover, in view of the fact that both the Free Exercise and Establishment Clauses impose restrictions on the conduct of government relating exclusively to religious activities, in many instances “government officials cannot discharge their constitutional obligations without close examination of ... particular conduct to determine if it is properly deemed to be religious and if so whether allowing it would constitute a prohibited establishment of religion.” Id. at 47.
On remand to the District Court after we vacated the injunction, Bronx Household again moved for a preliminary injunction against enforcement of Reg. I.Q., this time on different grounds. Bronx Household asserted that our prior ruling, which was based on its Free Speech Clause claim, should not close the matter as neither we nor the District Court had passed on its claims that Reg. I.Q. violated the Free Exercise Clause. The District Court again granted a preliminary injunction, Bronx Household of Faith v. Bd. of Educ. of City of New York, 855 F.Supp.2d 44 (S.D.N.Y.2012), and went on to grant summary judgment in favor of Bronx Household, permanently enjoining the enforcement of Reg. I.Q. Bronx Household of Faith v. Bd. of Educ. of City of New York, 876 F.Supp.2d 419 (S.D.N.Y.2012).
Defendants appealed, and this case is now before us for the sixth time.
DISCUSSION
The District Court concluded for a number of reasons that the enforcement of *190 Reg. I.Q. to exclude religious worship services would violate the Free Exercise Clause and the Establishment Clause. We respectfully disagree.

A. The Free Exercise Clause

1) The Free Exercise Clause does not entitle Bronx Household to a grant from the Board of a subsidized place to hold religious worship services.

The District Court found that the enforcement of Reg. I.Q. to exclude religious worship services would violate Bronx Household’s rights under the Free Exercise Clause because the City’s schools are “the only location in which [Bronx Household’s congregation] can afford to gather as a fall congregation [for Sunday worship services] without having to curtail other of their religious practices.” Bronx Household, 876 F.Supp.2d at 426. The District Court cited no authority for this proposition, and we know none.
The Free Exercise Clause bars government from “prohibiting the free exercise” of religion. U.S. Const, amend. I (“Congress shall make no law ... prohibiting the free exercise [of religion].”). In the District Court’s view, because Bronx Household and its congregants have a constitutional right to worship as they choose without interference from government, and cannot afford to pay for a large enough site to accommodate the entire congregation, the Free Exercise Clause obligates the Board to provide them with a subsidized facility in which to exercise the right. The Free Exercise Clause, however, has never been understood to require government to finance a subject’s exercise of religion. And to the extent any such suggestion has been raised in litigation, it has been rejected. See, e.g., Locke v. Davey, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) (finding that the exclusion of devotional theology degree programs from eligibility for state scholarships does not violate Free Exercise Clause); Skoros v. City of New York, 437 F.3d 1, 39 (2d Cir.2006) (“Just as government may not compel any person to adopt a prescribed religious belief or form of worship, no person may require the government itself to behave in ways that the individual believes will further his or her spiritual development.” (internal quotation marks and emphasis omitted)); Eulitt ex. rel. Eulitt v. Maine Dep’t of Educ., 386 F.3d 344, 354 (1st Cir.2004) (“The fact that the state cannot interfere with a parent’s fundamental right to choose religious education for his or her child does not mean that the state must fund that choice....”); see also Regan v. Taxation With Representation of Washington, 461 U.S. 540, 549-50, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (“We have held in several contexts that a legislature’s decision not to subsidize the exercise of a fundamental right does not infringe the right.... The reasoning of these decisions is simple: although government may not place obstacles in the path of a person’s exercise of ... freedom of speech, it need not remove those not of its own creation.” (internal quotation marks and brackets omitted)).

2) The Supreme CouH’s ruling in Lukumi that invidiously discriminatory ordinances targeting a religious practice of a particular religion are subject to strict scrutiny has no application to Reg. I.Q.

The District Court believed that under authority of the Supreme Court’s ruling in Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (“Lukumi ”), the validity of Reg. I.Q. must be assessed under strict scrutiny because it prohibits the provision of a subsidized premises for *191 the conduct of religious worship services, constitutes a discrimination against religion generally, and constitutes a discrimination against those religions that conduct worship services. Bronx Household, 876 F.Supp.2d at 428-32. We respectfully disagree. In our view the District Court’s reasoning is incorrect for several reasons. In the first place, we think the District Court’s view that Reg. I.Q. is subject to strict scrutiny is based on a misunderstanding of Lukumi Secondly, on facts very similar to these, the Supreme Court has rejected applicability of strict scrutiny. Furthermore, a reasonable governmental decision not to subsidize a category of activity is not a suspect discrimination among religions merely because some religions do and others do not engage in that activity.

a) Suspect discrimination against religion.

The District Court believed that, under the Lukumi precedent, because the conduct of religious worship services is an activity that has no secular analog, a decision by the Board not to subsidize it is necessarily a suspect discrimination against religion to be assessed under strict scrutiny. But see note 4; Bronx Household III, 492 F.3d at 92-106 (Calabresi, J. concurring); Bronx Household IV, 650 F.3d at 51-52 (Calabresi, J., concurring). It is correct without question that in declining to furnish school facilities for the conduct of religious worship services, Reg. I.Q. focuses on a religious activity that has no secular analog. There is no such thing as a nonreligious “religious worship service.” In our view, the District Court’s conclusion is based on a misunderstanding of the Supreme Court’s opinion. While there are indeed words in the Lukumi opinion, which, if taken out of context, could be read as expressing such a message, it becomes clear when the words are considered in context that they mean no such thing.
In Lukumi, worshipers in the Santería religion, in which animal sacrifice plays an important part of worship services, were planning to build a house of worship in the city of Hialeah, Florida. 508 U.S. at 525-26, 113 S.Ct. 2217. Members of Hialeah’s city council disapproved of Santeria’s practice of animal sacrifice and, with a goal of banning the practice, the council passed a set of ordinances prohibiting the unnecessary killing of animals in a ritual or ceremony not primarily for the purpose of food consumption. Id. at 526-28, 113 S.Ct. 2217. Hialeah claimed that the prohibition was motivated by secular objectives including public health and prevention of cruelty to animals. Id. at 527-28, 113 S.Ct. 2217. Although the set of ordinances was designed to appear to apply even-handedly to religious and secular conduct alike, a plethora of exceptions and exclusions (exempting, for example, fishing and Kosher slaughter) made the prohibition apply almost exclusively to the Santería ritual of animal sacrifice. Id. at 535, 113 S.Ct. 2217 (“[A]lmost the only conduct subject to [the prohibition] is the religious exercise of Santería church members.”). In addition, the legislative history revealed that disapproval of animal sacrifice as a Santería religious ritual had in fact motivated the legislators. Id. at 534, 113 S.Ct. 2217 (“[Suppression of the central element of the Santería worship service was the object of the ordinances.”). Furthermore, although the legislation claimed a variety of secular goals, those objectives were belied by exclusions that were incompatible with those goals because they widely permitted animal sacrifice outside the context of Santería religious ceremonies. Id. at 536, 113 S.Ct. 2217. Because the prohibition was found to be motivated by disapproval of a religious practice and *192 represented an attempt suppress it, and because, notwithstanding its disguise, it in fact applied almost exclusively to the Santería ritual of animal sacrifice, the Supreme Court found that the ordinances were subject to strict scrutiny, and that they violated the plaintiffs’ free exercise rights. Id. at 547,113 S.Ct. 2217.
The Lukumi opinion, indeed, declared the “principle” that “government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief,” id. at 543, 113 S.Ct. 2217 (emphasis added), thus justifying strict scrutiny. It characterized this principle as “essential to the protection of the rights guaranteed by the Free Exercise Clause.” Id. Yet, there are crucial differences between the facts in Lukumi and those in the present case. First, the ordinances in Lukumi were intended to, and did, suppress a religious ritual of a particular faith, by prohibiting its performance in the city. Reg. I.Q. does no such thing. It leaves all religions free without interference to engage in whatever religious practices they choose (including, of course, religious worship services) throughout the City. It represents only a decision by the Board not to subsidize religious worship services by providing rent-free school facilities in which to conduct them.
Second, the Hialeah ordinances were motivated by the city council’s disapproval of the targeted religious practice. The Board has no such motivation. There is not a scintilla of evidence that the Board disapproves of religion or any religion or religious practice, including religious worship services. Its sole reason for excluding religious worship services from its facilities is the concern that by hosting and subsidizing religious worship services, the Board would run a meaningful risk of violating the Establishment Clause by appearing to endorse religion. This difference is of crucial importance in determining the reach of Lukumi’s reasoning that a burdensome regulation focused on a religious practice is constitutionally suspect and therefore subject to strict scrutiny. This reasoning makes perfect sense when the regulation’s focus on religion is gratuitous, and all the more so when it is motivated by disapproval of religion (or of a particular religion or religious practice). On the other hand, it makes no sense when the regulation’s focus on religion is motivated by the governmental entity’s reasonable interest in complying with the Establishment Clause. The Free Exercise and Establishment Clauses place limits on the conduct of all governmental entities. The Free Exercise Clause prohibits government from interfering with free exercise of religion. The Establishment Clause prohibits government from engaging in conduct that would constitute an establishment of religion, such as endorsing, or seeming to endorse, a religion. It is only to the extent that governmental conduct affects religion that the restrictive force of the Religion Clauses is operative. Accordingly, rules and policies designed to keep a governmental entity in conformity with its obligations under the Religion Clauses must of necessity focus on religious subject matter. If the focus is not religious, the Religion Clauses have no application. Such focus on religion is neither an invidious discrimination nor constitutionally suspect. To the contrary, it is inevitable.
To illustrate, we consider a number of rules that might be adopted with the purpose of complying with the Religion Clauses. One such rule might state, “This city shall not adopt any rule or practice that constitutes an improper burden on the free exercise of religion, or that constitutes an establishment of religion.” Or a school *193 board might adopt a rule stating, “No school or teacher shall compel any student to participate in religious exercises, or seek to persuade any student to alter his or her religious beliefs.” Such rules can hardly be constitutionally suspect in view of the fact that they are constitutionally mandated. Going further, a reformed Hialeah, chastened by the Supreme Court’s ruling in Lukumi, might adopt a new ordinance that summarizes the Supreme Court’s ruling. The ordinance might provide something like, “Under no circumstances will this city pass any ordinance prohibiting any practice undertaken as a religious exercise, unless it similarly prohibits the practice when done in a secular context, and in no circumstances will a practice be prohibited because of disapproval of the practice as a religious ceremony.” Or, in recognition of the Supreme Court’s recent ruling in Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C., — U.S.-, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012), that there is a constitutionally compelled “ministerial exception” to the laws forbidding discrimination in employment, the Congress might pass a statute amending the federal laws that forbid discrimination in employment, stating something like, “No minister of a religious faith shall have a claim against the church or religious organization that employs the minister for the performance of ministerial duties.” These hypothetical rules — the very rules declared by the Supreme Court to be constitutionally mandated — do not represent invidious discrimination against religion and are not constitutionally suspect simply because the limitations they impose target religion. They target religion in order to give effect to the Constitution’s Religion Clauses, which themselves apply only to religion. Yet under the District Court’s analysis, a statute stating the rule of Lukumi would fail to pass the test of Lukumi, and a statute stating the rule of Hosanna-Tabor would fail to pass the test of Hosanna-Tabor. We believe the District Court has misunderstood Lukumi in construing it to mean that a rule declining to subsidize religious worship services so as not to risk violating the Establishment Clause is automatically constitutionally suspect and subject to strict scrutiny.

b) Locke v. Davey.

More importantly, upon facts very similar to ours, the Supreme Court has expressly ruled that where motivated by Establishment Clause concerns, a governmental decision to exclude specified religious causes from eligibility to receive state educational subsidies is neither a violation of free exercise, nor even subject to strict scrutiny under Lukumi,[6] In Locke v. Davey, 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004), the State of Washington had established a scholarship program to assist academically gifted students in post-secondary education. 540 U.S. at 715, 124 S.Ct. 1307. The state, however, provided by statute and by provision of its constitution that students pursuing a degree in theology were not eligible to receive the scholarship grants. Id. at 716, 124 S.Ct. 1307. This restriction was challenged by Davey, a gifted student, who was awarded a grant but was informed that it could not be used to pursue the degree in pastoral ministries he sought. Id. at 717, 124 S.Ct. 1307. Davey brought suit alleging, among *194 other claims, that the state’s refusal to allow use of its scholarship funds for the study of theology was, under the rule of Lukumi, presumptively unconstitutional and subject to strict scrutiny. Id. at 720, 124 S.Ct. 1307. Recognizing the state’s Establishment Clause interest underlying the restriction, the Court observed that “[t]he[ ] two [Religion] Clauses ... are frequently in tension. Yet we have long said that there is room for play in the joints between them. In other words, there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause.” Id. at 718-19, 124 S.Ct. 1307 (citations and internal quotation marks omitted). Specifically addressing Davey’s claim that the prohibition was presumptively unconstitutional and subject to strict scrutiny pursuant to Lukumi, the Court concluded:
We reject his claim of presumptive unconstitutionality, however; to do otherwise would extend the Lukumi line of cases well beyond not only their facts but their reasoning. In Lukumi the city of Hialeah made it a crime to engage in certain kinds of animal slaughter. We found that the law sought to suppress ritualistic animal sacrifices of the Santería religion. In the present case, the State’s disfavor of religion (if it can be called that) is of a far milder kind. It imposes neither criminal nor civil sanctions on any type of religious service or rite. It does not deny to ministers the right to participate in the political affairs of the community. And it does not require students to choose between their religious beliefs and receiving a government benefit. The State has merely chosen not to fund a distinct category of instruction.
Id. at 720-21, 124 S.Ct. 1307 (citations and footnote omitted).
Finding no animus toward religion in the legislative history or text of the prohibition, nor in the operation of the scholarship program, and finding substantial evidence indicating a historical aversion to using tax funds to support the ministry, “which was one of the hallmarks of an ‘established’ religion,” id. at 722-25, 124 S.Ct. 1307, the Court concluded that, “[g]iven the historic and substantial state [anti-establishment] interest at issue, we therefore cannot conclude that the denial of funding for vocational religious instruction alone is inherently constitutionally suspect.” Id. at 725, 124 S.Ct. 1307. Accordingly, Davey’s Free Exercise Clause claim failed because “[t]he State’s [anti-establishment] interest in not funding the pursuit of devotional degrees is substantial and the exclusion of such funding places a relatively minor burden on [students eligible for scholarship funds].” Id.
As Washington’s exclusion of students of theology from eligibility for the state’s subsidies was not subject to strict scrutiny under Lukumi because the exclusion was enacted in the interest of establishment concerns, we can see no reason why the rule should be any different in this case. We see no meaningful distinctions between the cases. Our record reveals no animus toward religion generally or toward a particular religion, or religious practice in either the text of Reg. I.Q. or the operation of Board’s policy. Underlying the Board’s prohibition is a slightly different manifestation of the same historical and constitutional aversion to the use of public funds to support the practice of religion cited by the Court in Locke. As in Locke, the Board’s interest in respecting the principle of the Establishment Clause that disfavors public funding of religion is substantial, and the burden, if it can properly be called a burden, that falls on Bronx Household in needing to find a location that is not subsidized by the City for the conduct of its *195 religious worship services, is minor from a constitutional point of view.
We do not mean to imply that merely by claiming the motivation of observing interests favored by the Establishment Clause a governmental entity gets a free pass, avoiding all scrutiny. We recognize that a school authority’s prohibition of a religious practice, even if explained as an attempt to comply with constitutional responsibilities, can in some circumstances represent a suspect discrimination against religion, which violates one or both of the Religion Clauses. A court would likely have rejected, for example, a claim by Hialeah that its ordinances, which prohibited almost exclusively a religious practice of the Santería church, were permissible in light of Hialeah’s interest in observing the Establishment Clause. See Good News Club, 533 U.S. at 112-19, 121 S.Ct. 2093 (“[AJccording to Milford, its restriction was required to avoid violating the Establishment Clause. We disagree.”).
Our point is therefore not that a refusal to subsidize a religious practice, sought to be justified as an effort to comply with the Establishment Clause, necessarily defeats a claim of violation of the Free Exercise Clause. It is rather that Lukumi’s invocation of presumptive unconstitutionally and strict scrutiny cannot reasonably be understood to apply to rules that focus on religious practices in the interest of observing the concerns of the Establishment Clause. The constitutionality of such rales must be assessed neutrally on all the facts and not under strict scrutiny.

c) Discrimination against particular religions.

We also disagree with the District Court’s view that Reg. I.Q. is a constitutionally suspect discrimination among religions because it affects religions that conduct worship services and does not affect religions that do not. Reg. I.Q. treats all religions in the same fashion. It leaves all religions free to engage in whatever practices they wish anywhere other than the Board’s school facilities. Furthermore, to the extent that different religions choose to avail themselves of the Board’s subsidized facilities, Reg. I.Q. treats them all similarly as to what they may do and may not do. The “religious worship services” prohibition bars all conduct of religious worship services in the school facilities. The activities not prohibited are likewise permitted to all users.
Religions that conduct religious worship services are not excluded by Reg. I.Q. from the use of school facilities. They may use the facilities for the same purposes and in the same manner as the facilities are used by religions that do not conduct religious worship services. They may use the facilities to teach religion, read from and discuss the Bible, advocate their religious views, sing hymns, say prayers, and do all things that must be permitted under the rule of Good News Club. Such religions, it is true, may not use the school facilities for the conduct of religious worship services. While Reg. I.Q. thus treats these two classes of religions equally, its impact on them will be different to the extent that religions that do not conduct religious worship services will not apply to conduct religious worship services and will therefore not be refused something they might have wanted, while religions that do conduct religious worship services, such as Bronx Household, may ask to conduct religious worship services and be denied.
It does not follow, however, that such a disparate impact violates the Free Exercise Clause. “[I]t is a basic tenet of First Amendment law that disparate impact does not, in itself, constitute viewpoint discrimination.” Christian Legal Soc. *196 Chapter of the Univ. of California, Hastings Coll, of the Law v. Martinez, 561 U.S. 661, 130 S.Ct. 2971, 2996, 177 L.Ed.2d 838 (2010). In Lukumi, the reason for striking down the Hialeah ordinances was not that the Santería religion wished to practice animal sacrifice while other religions did not. The prohibition of Santeria’s ritual animal sacrifice was struck down because the evidence showed that the prohibition was motivated exclusively by discriminatory disapproval of that religious practice, and that the city’s claim that the ordinances were motivated by public health and other neutral concerns was false. It is the clear implication of the Supreme Court’s opinion that, if the prohibition had applied across-the-board, affecting religious and secular practice equally, and had not been motivated by hostility to Santeria’s religious practice, the prohibition would have been upheld, notwithstanding that it would have burdened the Santería religion without similarly burdening other religions that do not practice animal sacrifice. See Lukumi, 508 U.S. at 547, 113 S.Ct. 2217 (“Those in office must be resolute in resisting importunate demands and must ensure that the sole reasons for imposing the burdens of law and regulation are secular. Legislators may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices. The laws here in question were enacted contrary to these constitutional principles, and they are void.”).
Thus, it is clear that the Free Exercise Clause would not prohibit the Board from denying permits to those seeking to use school facilities for the killing of animals, or for boxing, or other martial arts contests, so long as the Board’s restriction applies to secular usage as well as religious, and was not motivated by discriminatory disapproval of any particular religion’s practices. The Board is not compelled to permit a practice it has a justifiable reason for excluding just because the exclusion may affect one religion that practices the excluded conduct while not affecting other religions that do not.
Nothing in this record remotely supports a finding that the Board disapproves of religious worship services or wishes to favor religions that do not practice religious worship services over those that do. The Board’s only motivation is to act consistently with its establishment concerns and protect itself against reasonable Establishment Clause challenges.[7]
We conclude that Lukumi’s invocation of strict scrutiny has no application to these facts, and that Reg. I.Q. does not impose an unconstitutional burden on Bronx Household’s right of free exercise of religion.[8]

*197
3) If the Board has a reasonable, good faith concern that making its school facilities available for the conduct of religious worship services tvould give rise to a substantial risk of violating the Establishment Clause, the permissibility of the Board’s refusal to do so does not turn on whether such use of school facilities would in fact violate the Establishment Clause.

As in Bronx Household TV, we do not reach the question whether the Board would violate the Establishment Clause by allowing the subsidized use of the school facilities for religious worship services because we believe it is unnecessary to do so. The District Court acknowledged that a motivation to avoid violation of the Establishment Clause would justify the Board’s exclusion of religious worship services if allowing the conduct of religious worship services would in fact violate the Establishment Clause. But the court expressed the view that, unless the excluded practice would in fact constitute a violation of the Establishment Clause, steering clear of conduct that might be reasonably suspect under the Establishment Clause does not furnish adequate reason for declining to offer the school facilities for the conduct of religious worship services. Bronx Household, 876 F.Supp.2d at 433-37. The Board contends this was error.
We cannot accept the District Court’s rule for two reasons. First, this rule would unfairly put the Board in an impossible position of being compelled at its peril to risk violating one Religion Clause or the other if it wrongly guessed the Establishment Clause’s exact contours. Second, the District Court’s rule contradicts the most nearly comparable Supreme Court authority, as well as clear Second Circuit authority.
No extant decision by the Supreme Court permits the Board to predict with confidence whether it might be found in violation of the Establishment Clause if it offers its school facilities to Bronx Household, as well as numerous other churches, for the conduct of subsidized worship services (virtually all of which would be Christian services held on Sundays, as that is when the school facilities are most available for such use). Essentially two choices are open to the Board. It can either make its facilities available for worship services, or decline to do so. If the rule were as the District Court proposed, a wrong guess as to what the Supreme Court will eventually hold would put the Board in violation of one of the two Religion Clauses. If the Board declines to host and subsidize religious worship services, and the Supreme Court eventually rules that allowing religious worship services would not violate the Establishment Clause, the Board would have committed years of violations of the Free Exercise Clause rights of rejected permit applicants. On the other hand, if the Board offers its facilities for subsidized religious worship services, and the Supreme Court eventually rules that the practice causes sufficient appearance *198 of endorsement to constitute a violation of the Establishment Clause, the Board would have committed years of violation of that clause. Under the District Court’s rule, the Board would be compelled to speculate with little guidance which way the Supreme Court will eventually go, and if it guesses wrong, it would have committed extensive violations of one of the Religion Clauses. Such a rule would be exceedingly unfair to the Board. In our view, the better rule allows the Board, if it makes a reasonable, good faith judgment that it runs a substantial risk of incurring a violation of the Establishment Clause by hosting and subsidizing the conduct of religious worship services, to decline to do so.[9]
Furthermore, the Supreme Court in Locke expressly rejected the District Court’s rule. As we explained above, in Locke the Court was ruling on the question whether the State of Washington, acting pursuant to constitutional and historical concerns about government funding of religious practices, could lawfully exclude students seeking degrees in theology from eligibility for state scholarship grants. In ruling that the exclusion did not violate the free exercise rights of the plaintiff who was ineligible for grant funds because he was pursuing a degree in theology, the Court explicitly considered and rejected the argument that establishment concerns could justify the religion-based exclusion only if the reviewing court concluded that granting the subsidy for the excluded religious purpose would in fact violate the Establishment Clause. It explained, as set forth above, that “there is room for play in the joints between [the Religion Clauses].... [S]ome state actions permitted by the Establishment Clause ... [are] not required by the Free Exercise Clause.... If any room exists between the two Religion Clauses, it must be here.” 540 U.S. at 718-19, 725, 124 S.Ct. 1807 (internal quotation marks omitted). If it was clear that the State of Washington was free in service of establishment interests to exclude theology students from eligibility for its scholarships, even though making them eligible would not have violated the Establishment Clause, we see no reason why the Board may not similarly in service of the establishment interests decline to subsidize religious worship services, even if subsidizing them would not violate the Establishment Clause.
Furthermore, our court has repeatedly rejected the District Court’s rule. In Marchi v. Bd. of Coop. Educ. Servs. of Albany, 173 F.3d 469 (2d Cir.1999), we considered a teacher’s claim that his First Amendment rights were violated by a school board directive that he “cease and desist from using any references to religion in the delivery of [his] instructional program unless it is a required element of a course of instruction for [his] students and has prior approval by [his] supervisor.” Id. at 472-73. We decided that the school board “d[id] not impermissibly infringe Marchi’s free exercise rights” in interpreting the directive to prohibit communications that “sufficiently intruded religious content into a curricular matter, not involving religion, such that the school authorities could reasonably be concerned that communications of this sort would expose it to non-frivolous Establishment Clause challenges.” Id. at 477. We recognized that “when government endeavors to police itself and its employees in an effort *199 to avoid transgressing Establishment Clause limits, it must be accorded some leeway, even though the conduct it forbids might not inevitably be determined to violate the Establishment Clause” because “[t]he decisions governmental agencies make in determining when they are at risk of Establishment Clause violations are difficult.” Id. at 476; see id. (“[I]n dealing with their employees, [governmental agencies] cannot be expected to resolve so precisely the inevitable tensions between the Establishment Clause and the Free Exercise Clause that they may forbid only employee conduct that, if occurring, would violate the Establishment Clause and must tolerate all employee conduct that, if prohibited as to non-employees, would violate the Free Exercise Clause.”).
And in Skoros v. City of New York, 487 F.3d 1 (2d Cir.2006), we considered a Free Exercise Clause challenge to New York City Department of Education’s school holiday display policy, which had been promulgated in light of Establishment Clause concerns. The policy permitted the display of “secular” holiday symbols including Christmas trees, menorahs and the star and crescent but did not permit a creche to be displayed as a symbol of Christmas. Id. at 5-6. We decided that the holiday display policy did not violate the Free Exercise Clause and, in doing so, recognized that even though the policy might have permitted a creche to be displayed without violating the Establishment Clause, “we afford the government some leeway in policing itself to avoid Establishment Clause issues, even if it thereby imposes limits that go beyond those required by the Constitution.” Id. at 34-35.
Returning to the present case, as we explained at length in Bronx Household IV, the Board has substantial reasons for concern that hosting and subsidizing the conduct of religious worship services would create a substantial risk of liability under the Establishment Clause. “[T]he Supreme Court has warned that violation of the Establishment Clause can result from perception of endorsement. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief.” 650 F.3d at 41 (internal quotation marks omitted). As we explained, during Sunday services, under the District Court’s injunction, the Board’s schools are dominated by church use: “Church members post signs, distribute flyers, and proselytize outside the school buildings. In some schools, no other outside organizations use the space. Accordingly, on Sundays, some schools effectively become churches [as] both church congregants and members of the public identify the churches with the schools.” Id. at 42. We noted also that the fact that school facilities are available for such use primarily on Sundays results in an unintended bias in favor Christian religions, which prescribe Sunday as the principal day for worship services, while Jews and Muslims, for example, hold worship services on days during which school facilities are less available for such use. Id. at 43. All of this, which we explained in greater detail in our earlier opinion, supports a reasonable concern on the part of the Board that hosting and subsidizing the conduct of religious worship services might support a non-frivolous claim that the Board is creating a public perception of endorsement of religion. Id. at 42.
In view of (1) the absence of discriminatory animus on the part of the Board against religion, or against religions that conduct worship services; (2) the bona fides and the reasonableness of the Board’s concern that offering school facilities for the subsidized conduct of religious worship services would create a substantial risk of incurring a violation of the Estab *200 lishment Clause claim; and (3) the fact that the Board’s policy (a) leaves all persons and religions free to practice religion without interference as they choose, (b) treats all users, whether religious or secular, in identical fashion, and (c) imposes no burden on any religion, leaving all free to conduct worship services wherever they choose other than the Board’s schools; as well as the other reasons recited in this opinion and in Bronx Household IV, we conclude that Reg. I.Q. does not violate Plaintiffs’ rights to free exercise of religion, whether or not it is subject to strict scrutiny.

B. The Establishment Clause

1) The District Court erred in concluding that Reg. I.Q. violates the Establishment Clause because it compels the Board to become excessively entangled with religion by deciding what are religious worship services.

The District Court ruled that the Board’s very act of determining whether a proposed use of the school facilities is a religious worship service (and therefore is prohibited by Reg. I.Q.) would constitute an excessive entanglement with religion, which violates the Establishment Clause. Bronx Household, 876 F.Supp.2d at 440-45; see Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). We disagree for a number of reasons.
When this case was before us in Bronx Household IV, Bronx Household presented us with the same argument. We rejected it. First, we noted that whatever merit the argument might have in other circumstances, it could have no application here because Bronx Household acknowledged its intention to conduct religious worship services in the school facilities. Its application for an extended use permit specified its intention to conduct “Christian worship services.” 650 F.3d at 35. Furthermore, we noted that Bronx Household’s argument “overlook[ed] the nature of the duties placed on government officials by the Establishment Clause.” Id. at 47. The Establishment Clause prohibits government officials from taking action that would constitute an establishment of religion. In many circumstances, especially when dealing with applications to conduct arguably religious exercises on public property, government officials cannot discharge their obligations under the Establishment Clause without examining the conduct to determine whether it is in fact religious and, if so, whether the conduct is of such nature that allowing it to take place on public property would constitute a prohibited establishment of religion. If public officials were not permitted to undertake such inquiries, they could not discharge their duties to guard against violation of the Establishment Clause. Thus, the Constitution, far from forbidding government examination of arguably religious conduct, at times compels government officials to undertake such inspection in order to draw constitutionally necessary distinctions. We concluded that “the mere act of inspection of religious conduct” did not constitute excessive entanglement, observing that to prohibit such inspection “would effectively nullify the Establishment Clause.” Id.
On remand, the District Court concluded that “[fjactual and legal developments since [Bronx Household IV] merit reconsideration of Plaintiffs’ Establishment Clause claim.” Bronx Household, 855 F.Supp.2d at 60-61. In particular, the District Court pointed to “new facts documenting how the Board’s current policy fosters excessive governmental entanglement” and the Supreme Court’s recent decision in Hosanna-Tabor. Id. at 64. The District Court believed this decision *201 pertinent because the Supreme Court “emphasized the wide berth religious institutions are to be given with respect to their core activities, including worship.” Id. at 63. Upon reconsidering Bronx Household’s Establishment Clause claim, the District Court concluded that Reg. I.Q. compels Board officials to become excessively entangled with religion by requiring them “to make their own bureaucratic determinations as to what constitutes ‘worship,’ ” contravening Hosannah-Tabor’s prohibition of such government involvement in ecclesiastical decisions. Bronx Household, 876 F.Supp.2d at 440.
We respectfully disagree. The evidentiary record does not sustain the district court’s findings that the Board makes its own determination whether an applicant’s proposed activities constitute a religious worship service. And, in any event, Hosanncu-Tabor does not support the proposition that it would be improper for the Board to make such a determination.
The Board’s policy is not to make its own determination whether conduct proposed by an applicant constitutes a religious worship service. To the contrary, the Board’s policy is to rely on the applicant’s own characterization as to whether the applicant will conduct religious worship services. Under Reg. D-180, every extended use applicant must submit an application for a permit. The application form requires the applicant to provide a “Description of Activities to be conducted,” and to sign a certification that “the Information I have provided ... is complete and accurate to the best of my knowledge,” and that “the activities to be conducted ... do not include any of the prohibited uses described ... in Chancellor’s Regulation D-180.” App. 996.[15] The Board reviews the applicant’s “Description of Activities to be conducted” to see whether the applicant has stated an intention to conduct religious worship services. It does not consider whether proposed activities that the application does not describe as a religious worship service in fact constitute a religious worship service. The Board may, however, look beyond the application at the applicant’s website and other public materials. If the applicant states on its website or in other public materials an intention to conduct a religious worship service without having acknowledged that intention in its application, the Board may either request an explanation of the apparent discrepancy or deny the application pursuant to § II.L of Reg. D-180. As with respect to the application itself, in reviewing an applicant’s website or other public materials, the Board does not make its own assessment whether the described activities constitute a religious worship service but limits its inquiry to the applicant’s own characterization. The Board, furthermore, makes no attempt to define, or impose on applicants a definition of, what constitutes a “religious worship service.”
Although it is uncontradicted that the Board’s policy is not to make its own determination whether an applicant’s proposed activities constitute a religious worship service, but rather to rely exclusively on the applicant’s own characterization, the District Court nonetheless concluded that Reg. I.Q. compels excessive entanglement because the Board acknowledged *202 that its policy of not making its own determination had not in every instance been properly carried out. Bronx Household, 876 F.Supp.2d at 440-41. For example, the Board acknowledged an instance (not involving Bronx Household) in which, contrary to Board policy, a permit applicant who indicated that the activities to be conducted included “Prayer” and “Bible Study” was told by a Board representative that “Bible study would be ok, but not prayer meetings.” The fact that .there have been instances, none involving Bronx Household, in which Board personnel improperly deviated from the Board’s policy cannot justify the District Court’s conclusion that Reg. I.Q. compels excessive entanglement and is therefore unconstitutional.
The District Court also justified its finding based on the fact that the Board’s policy permits the Board to inspect an applicant’s website and other public materials. The court explained,
While this approach of looking beyond the four corners of the Extended Use Application may be proper for purposes of verifying a political or commercial applicant’s compliance with Ch. Reg. D-180, the same cannot be said of verifying whether a religious applicant is complying with the worship-related provisions of the regulation. This is because it is the religious adherents alone who can determine for themselves how to “shape their own faith,” Hosannar-Tabor, 132 S.Ct. at 706, and no amount of bureaucratic second-guessing—even if based solely on the adherents’ own words—may invade their province.
Bronx Household, 876 F.Supp.2d at 442 (citation, brackets and internal quotation marks omitted).
We believe the District Court’s reasoning was flawed in two respects. First, as explained above, the Board’s policy providing that it may examine an applicant’s website and other public materials (in addition to the application) was not a deviation from the Board’s policy of accepting an applicant’s own characterization of whether its activities constitute a religious worship service. According to the Board’s policy, it is only when an applicant itself characterizes its conduct as a religious worship service that the Board will consider it to be such. The aspect of the Board’s policy that allows it to look at an applicant’s website and other public materials in addition to the application does not represent a deviation from the policy of using only an applicant’s own characterization.
Because the Board does not make its own determinations whether an applicant’s proposed activities constitute worship services, the District Court’s interpretation of Hosannar-Tabor as prohibiting a governmental authority from making such determinations has no pertinence. But, even if the Board were making its own determinations, Hosannar-Tabor would not prohibit such a policy. The Supreme Court’s ruling rather supports the opposite conclusion.
In Hosanna-Tabor, the plaintiff Perich, who was employed by a church to teach in a capacity regarded by the church as that of a, minister, was dismissed from her employment after developing an illness and taking a period of disability leave. 132 S.Ct. at 700. The plaintiff sued for reinstatement, alleging that her dismissal violated the Americans with Disabilities Act (the “ADA”), 42 U.S.C. § 12101 et seq. (1990). Id. at 701. The Supreme Court ruled in favor of the church, holding .that, because the plaintiff was employed by the church as a minister, she had no claim against the church under the employment discrimination laws. Id. at 707-10. The Court reasoned that, because the Free Exercise Clause requires that religions be *203 free to select their own ministers, and because the Establishment Clause is offended by giving the state the power to determine which individuals will minister to the faithful on behalf of a church, there is an implicit, constitutionally mandated “ministerial exception” to the employment discrimination laws. The Court explained,
Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group’s right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.
Id. at 706.
In the present case, even if the Board were making its own determination whether an applicant’s proposed conduct constitutes a religious worship service, Hosanna-Tabor would not support the conclusion that the Establishment Clause prohibits a governmental entity from making that determination. This is for two reasons.
First, the constitutional impropriety that led the Supreme Court to read a ministerial exception into the employment discrimination statutes is not present on these facts. The problem in Hosanna-Tabor was that, unless the employment discrimination laws are read not to apply to a claim against a church by a minister asserting a right to employment, the consequence would be that a governmental authority — a judge, or a jury, or an administrative agency — would dictate to the church whom it must employ to serve as minister, communicating its teachings to its faithful. The governmental authority would, to a significant extent, be directing, shaping and controlling the ecclesiastical actions of the church.
The Board deciding for itself whether an applicant’s proposed conduct constitutes a religious worship service would not entail imposing any such control over a church’s religious activity. Unlike Hosanna-Tabor, where a government authority would be requiring a church to communicate the tenets of its faith through a minister not of its own choosing, under no circumstances would the Board under Reg. I.Q. be telling any person or entity how to conduct worship services. The only practical consequences that would turn on the Board’s decision would be whether the Board would make its subsidized school facilities available to the applicant. The applicant would remain free to shape its religious worship services in any way it chose.[16]
*204 Hosanna-Tabor, moreover, does not merely fail to support Bronx Household’s claim of Establishment Clause violation due to excessive entanglement by the Board; it actively contradicts the argument. This is because in Hosanna-Tabor the Supreme Court itself did precisely what the District Court found a governmental entity prohibited from doing.
The conclusion that there is an implicit ministerial exception that bars a minister from suing the church that employs her under the ADA did not resolve the case. The question remained whether the plaintiff was a minister and thus subject to the ministerial exception. It was undisputed that, according to the church’s classification, the plaintiff served in the role of a commissioned minister.[17] If the District Court were correct, the church’s classification of the plaintiff as a minister would have ended the matter; the Supreme Court, a governmental authority, would have been compelled (so as to avoid excessive entanglement) to accept the church’s designation. The Court did not do so. It undertook to make its own determination whether the plaintiff was a minister subject to the ministerial exception. Based on its own assessment of the pertinent facts (including the nature of the duties assigned to her), the Court determined that she was a minister. See 132 S.Ct. at 707-08 (“As a source of religious instruction, Perich performed an important role in transmitting the Lutheran faith to the next generation. In light of ... the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church — we conclude that Perich was a minister covered by the ministerial exception.”).[18]
For all the reasons outlined above and as well as those we discussed in our earlier decision in Bronx Household IV, which we now reaffirm without need to repeat them, we conclude that the District Court erred in concluding that Reg. I.Q. violates the Establishment Clause by compelling the Board to make decisions that constitute excessive entanglement with religion.[19] *205 We have considered Bronx Household’s other arguments and find no merit in them.[20]
CONCLUSION
For the foregoing reasons, the judgment of the district court is REVERSED, and the injunction barring enforcement of Reg. I.Q. is VACATED.

. During this litigation, the Board was renamed the New York City Department of Education. See, e.g., A.R. ex rel. R.V. v. New York City Dep’t of Educ., 407 F.3d 65, 67 n. 2 (2d Cir.2005).

. Reg. D-180 § I.S. provides that ''[p]ermits may be granted to religious clubs for students that are sponsored by outside organizations and otherwise satisfy the requirements of this regulation on the same basis that they are granted to other clubs for students that are sponsored by outside organizations.”

."While the [Board] imposes no excess charge (profit or overhead) on extended use of its schools, there are pass-along contractual costs ... i.e., costs incurred in schools for custodial services when the use is outside of normal school hours.” Reg. D-180 § IV.A. Users may also incur charges for use of additional services or specialized equipment or facilities. See Reg. D-180 § V.

. Reg. I.Q. authorizes denial of a permit sought either for (1) "the purpose of holding religious worship services” or (2) "otherwise using a school as a house of worship.” In this opinion we limit our consideration to the first clause. Because we conclude that the denial of Bronx Household's application for a permit under this clause is constitutional, we have no need to consider whether the Board might also lawfully deny an application for a permit based solely on the second clause. Judge Calabresi notes that if worship that is not religious does exist, so that, as the dissent may be taken to suggest, Dissenting Op. at 206-07, the first clause discriminates against religious worship, the second clause, which does not distinguish between religious and any such putative nonreligious worship, would be sufficient to pass constitutional muster since it does not treat nonreligious worship more favorably than religious worship. See Bronx Household III, 492 F.3d at 92-106 (Calabresi, J., concurring); Bronx Household IV, 650 F.3d at 51-52 (Calabresi, J., concurring).

. We did not find that a violation of the Establishment Clause had occurred or would have occurred but for the prohibition on religious worship services but rather that “it was objectively reasonable for the Board to worry that use of the City’s schools for religious worship services ... expose[d] the City to a substantial risk of being found to have violated the Establishment Clause.” Bronx Household IV, 650 F.3d. at 43.

. Judge Walker argues in his dissent that “Locke is not applicable here ... because it dealt only with a government subsidy.” Dissenting Op. 7. However, Reg. I.Q. also concerns a government subsidy. As discussed above, the regulation represents a governmental decision not to subsidize religious worship services by providing rent-free facilities to house such services. See supra pp. 190-91, 191-92. Therefore, Locke is not distinguishable on this ground.

. Nor was the District Court correct in its view that Reg. I.Q. discriminates against "religions that fit the 'the ordained' model.” Bronx Household, 876 F.Supp.2d at 431. There is no evidence whatsoever that the Board applies Reg. I.Q. only where the proposed religious worship service would be conducted by an ordained minister. The District Court perhaps based this finding on our earlier observation in Bronx Household TV that "[r]eligious worship services are conducted according to the rules dictated by the particular religious establishment and are generally performed by an officiant of the church or religion.” 650 F.3d at 41 (emphasis added). This passage was descriptive, rather than prescriptive, and included the word "generally" to make clear that the presence of an officiant was merely a common feature, and not a definitional requirement of a religious worship service. Far from specifying that an ordained officiant is an essential feature of services to which Reg. I.Q. applies, the Board has essentially left it to applicants to state whether they will conduct religious worship services.

. Alternatively, the same sensible result could be reached through two other routes of interpretation. First, the Lukumi "principle” that *197 " government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief,” 508 U.S. at 543, 113 S.Ct. 2217 (emphasis added), might be deemed inapplicable to the present case on the ground that a government decision not to subsidize a religious activity is not deemed to constitute a "burden” on that activity, within the meaning of Lukumi. Or, the "strict scrutiny” test may apply, but be deemed satisfied when government decides not to subsidize a religious practice acting on a good faith and reasonable concern that such subsidizing would present a meaningful risk of being found in violation of the Establishment Clause. Regardless of which of these three analytical formulas is used, the validity of Reg. I.Q. would be sustained against Bronx Household’s Lukumi-based challenge.

. Cf. Ricci v. DeStefano, 557 U.S. 557, 585, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009) ("[UJnder Title VII, before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action.”).

. See also Reg. D-180 § II.L ("Providing incorrect, incomplete, or misleading information on the Permit Application or the failure to conform to any of the guidelines and/or limitations contained in this regulation, as well as any other applicable laws and regulations governing the use of school buildings and grounds, may lead to the revocation of the permit, the denial of future Permit Applications and other legal actions by the [Board].”).

. Nor could a decision by the Board overruling an applicant’s own understanding of whether proposed activities constituted a religious worship service ever deprive an applicant of the opportunity to conduct what it deemed to be a religious worship service. The denial of a permit application based on the Board’s rejection of the applicant’s own characterization of the proposed activities would occur only when the Board deemed activities that the applicant did not consider a religious worship service to be a religious worship service. In that circumstance, by definition, the denial would only prohibit use for activities that the applicant did not consider to be a religious worship service. The application would have lost no opportunity to conduct a religious worship service because of the Board’s own characterization of the proposed activities.

. "The Synod classifies teachers into two categories: 'called' and ‘lay.’ ... Once called, a teacher receives the formal title 'Minister of Religion, Commissioned’.... Hosanna-Tabor asked [the plaintiff] to become a called teacher. [She] accepted the call and received a 'diploma of vocation’ designating her a commissioned minister.” 132 S.Ct. at 699-700.

. Nor was the Supreme Court’s undertaking to determine for itself whether the plaintiff was a minister, rather than accept the church’s characterization, done carelessly without recognition of its implications for the excessive entanglement argument. Justice Thomas, who concurred in the judgment, wrote separately, espousing the very arguments Bronx Household makes here, to reject the aspect of the Court’s decision that refused to regard the church's characterization as conclusive. Justice Thomas argued that, in order not to intrude on theological decision, he would have deemed the plaintiff's ministerial status conclusively established by the fact that the church deemed her a minister. Id. at 711 (Thomas, JK., concurring) ("Hosanna-Tabor sincerely considered Perich a minister. That would be sufficient for me to conclude that Perich’s suit is properly barred by the ministerial exception.”). No justice joined in Justice Thomas’s objection. All of the eight other justices joined in one or both of the Chief Justice’s opinion for the Court, and the concurring opinion of Justice Alito, both of which explicitly justified the judgment on the Supreme Court's determination, rather than the church's designation, that the plaintiff was in fact performing in the role of a minister.

.We similarly reject Bronx Household’s claim that Reg. I.Q. causes excessive entanglement by requiring the Board to take an official position on religious doctrine. Unlike in Commack Self-Service Kosher Meats, Inc. v. Weiss, 294 F.3d 415 (2d Cir.2002), where we held laws defining “kosher” according to the dictates of Orthodox Judaism "excessively en *205 tangle government and religion because they (1) take sides in a religious matter, effectively discriminating in favor of the Orthodox Hebrew view of dietary requirements; (2) require the State to take an official position on religious doctrine; and (3) create an impermissible fusion of governmental and religious functions by delegating civic authority to individuals apparently chosen according to religious criteria,” id. at 425, the Board had not engaged in any comparable practices.

. In his dissent, Judge Walker advances many of the same arguments he advanced in Bronx Household IV, 650 F.3d at 52-65. Our responses are contained in previous Bronx Household opinions and set forth in this opinion.